FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          )
ROCHEUX INTERNATIONAL OF                  )
NEW JERSEY, INC.,                         )        Hon. Garrett E. Brown, Jr.
                                          )
                        Plaintiff,        )        Civ. No. 06-6147
                                          )
        v.                                )        **MEMORANDUM OPINION**
                                          )
U.S. MERCHANTS FINANCIAL GROUP, INC.,     )
U.S. MERCHANTS, INC. (a division of U.S.  )
Merchants Financial Group, Inc., and/or d/b/a )
U.S. Merchants), THE MERCHANT OF TENNIS   )
INC., and DIVERSIFIED REPACKAGING CORP.,)
                                          )
                        Defendants.       )
_____)

**BROWN**, Chief Judge:

        This matter comes before the Court upon cross-motions for summary judgment.  (Doc.

Nos. 88, 92.)  Defendants' cross-motion also seeks to redesignate affirmative defenses as

counterclaims pursuant to Federal Rule of Civil Procedure 8(c)(2).  Plaintiff also moves *in limine*

to exclude certain defense expert witnesses pursuant to Federal Rule of Evidence 702.  (Doc. No.

87.)  This Court heard oral argument on these motions on September 16, 2010.  For the following

reasons, the Court will grant Plaintiff's motion in part without prejudice and deny Defendants'

motion.  The Court will allow Defendants to redesignate their affirmative defenses, but the Court

will limit these counterclaims to the 2006 deliveries.  The Court will also deny Plaintiff's motion

*in limine* without prejudice and permit Plaintiff to refile in light of this Court's ruling with regard

to the other motions.

## I.    BACKGROUND

This case involves a contract dispute between Plaintiff Rocheux International of New Jersey, Inc. ("Rocheux"), a distributor of raw plastic materials, and Defendants U.S. Merchants Financial Group, Inc., U.S. Merchants Inc. (d/b/a U.S. Merchants or The Merchant of Tennis, Inc.), and Diversified Repackaging Corporation, who are California-based providers of plastic product-packaging services.  The dispute concerns large shipments of raw plastics delivered by Rocheux to Defendants between January and June 2006.  For purposes of the parties' cross-motions for summary judgment, the Court draws all reasonable inferences in the light most favorable to the respective non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.  Undisputed Facts

The Court begins with the uncontested facts.  The parties agree that Defendants ordered large quantities of raw PVC and APET plastic from Rocheux in 2005 and 2006, as demonstrated by purchase orders 21920, 22190, 22897, P13295, P13300, P13302, 20188, 20491, 20564, 20583, and 22488 (hereinafter "2005–2006 purchase orders").  (Pl.'s 56.1 Statement ¶ 1; Defs.' 56.1 Resp. ¶ 1.)  According to the parties' descriptions, the plastic was ordered by the pound and delivered in rolled-up form as more than 7,000 rolls of plastic the size of garbage cans.  (Flood Decl. ¶¶ 3, 9; *see also* Pl.'s Br. at 1; Defs.' Resp. Br. at 6.)  There is no dispute that Rocheux delivered to Defendants some of the plastic products related to the 2005–2006 purchase orders between January 2006 and June 2006 (hereinafter "2006 deliveries"), and that Rocheux sent Defendants invoices for these deliveries.  (*See* Pl.'s 56.1 Statement ¶¶ 2, 6; Defs.' 56.1 Resp.

2

¶¶ 2, 6.)  It is undisputed that Defendants did not pay for most if not all of the 2006 deliveries and that Defendants no longer possess the goods from the 2006 deliveries.  (Pl.'s 56.1 Statement ¶¶ 8, 12; Defs.' 56.1 Resp. ¶¶ 8, 12.)  According to Plaintiff, the outstanding balance for the 2006 deliveries is $2,116,571.76.  (Pl.'s 56.1 Statement ¶ 9; Stephanoff Decl. ¶ 32 & Ex. A; Defs.' 56.1 Resp. ¶ 9.)

In addition to the 2006 deliveries, it appears that Rocheux delivered some of the goods related to the 2005–2006 purchase orders to a local warehouse so that Defendants would be able to access the goods as needed on short notice.  These deliveries to the warehouse (hereinafter "warehouse goods") appear to have taken place between November 2005 and August 2006.  (Pl.'s 56.1 Statement ¶¶ 262, 266, 270, 274, 277, 280, 283, 286, 289, 292, 295, 298, 301, 305, 308, 311, 314, 317, 320, 323, 326, 329, 332, 335, 338, 341, 344, 347, 350, 353; McRavin Decl. ¶¶ 275, 279, 283, 287, 290, 293, 296, 299, 302, 305, 308, 311, 314, 318, 321, 324, 327, 330, 333, 336, 339, 342, 345, 348, 351, 354, 357, 360, 363, 366; Defs.' Resp. ¶¶ 262, 266, 270, 274, 277, 280, 283, 286, 289, 292, 295, 298, 301, 305, 308, 311, 314, 317, 320, 323, 326, 329, 332, 335, 338, 341, 344, 347, 350, 353.)  According to Rocheux Vice President and Chief Operating Officer Robert Stephanoff, the original purchase price for the warehouse goods was $1,582,282.31.  (Stephanoff Decl. ¶ 28; *see also* Defs.' 56.1 Statement ¶ 3.)  On September 24, 2006, Rocheux President Wendy Steed sent an email to Defendants' President and CEO Jeffrie Green requesting the delinquent payments for the 2006 deliveries and the warehouse goods by September 29, 2009, and notifying Defendants that their failure to pay would result in Rocheux selling the warehouse goods and seeking any deficiency from Defendants pursuant to UCC § 2-706.  (Steed Decl. ¶ 14 & Ex. F.)  Rocheux incurred $18,562.36 in freight charges and

3

$56,622.67 in additional warehouse charges in attempting to re-sell the warehouse goods, and Rocheux eventually sold the warehouse goods to third parties for $1,194,582.68, resulting in a deficiency of $387,699.70 compared to the original purchase price for the warehouse goods. (Pl.'s 56.1 Statement ¶¶ 18–19; Stephanoff Decl. ¶¶ 28–29; Defs.' 56.1 Resp. ¶¶ 18–19.)

### B. Disputed Facts

Although the parties do not contest the basic facts surrounding the 2006 deliveries and the warehouse goods, Defendants contest their liability for both, contending that the 2006 deliveries contained substantial amounts of unusable and/or nonconforming materials, and that Rocheux breached its contracts with Defendants when it resold the warehoused goods without Defendants' consent.  With regard to the 2006 deliveries, Defendants contend that they either rejected or revoked acceptance of the goods within a reasonable time after discovering latent defects in the plastic.  According to Defendants' Thermoforming Manager Nick Margaros, the plastic's medium—garbage can-sized rolls of plastic, delivered on large pallets—made it "impossible" to discover anything but external defects at the time of delivery.  Rather, internal defects would only be discovered once Defendants used machines to unwind the plastic from the rolls and thermoform the plastic film into individual packaging parts.  (Margaros Decl. ¶¶ 6–8.)  Such flaws would manifest themselves in the thermoformed products as discoloration, flow marks, waviness, pitting, and scratches.  (*Id.* ¶ 8.)  Packaging products containing these flaws could not be sold to Defendants' customers, and thus had to be sold as scrap.  (*Id.*)  Other latent flaws, such as products' sealing capabilities, could not be discovered until later in the manufacturing process. (*Id.*)  Mr. Margaros attests that Defendants discovered the above defects in a "substantial portion" of the plastic Rocheux sold to Defendants between 2000 and 2006 after processing the

4

materials in the above fashion, and that the goods made with this plastic were useless for anything other than scrap. (*Id.* ¶ 9.) Catalin Oprisan, who works for Defendants' accounting department, also states that Mr. Margaros notified his department of problems with Rocheux's materials on "a number of occasions between 2000 and the end of 2006." (Oprisan Decl. ¶ 4.) Although Defendants do not identify specific conversations Mr. Margaros had with Rocheux about problematic shipments during this time period, Mr. Margaros asserts that he contacted Rocheux representatives—specifically Allison Tuan Lee and Michael Flood—whenever "there was a quality issue to report," and that "[o]n each such occasion, [he] explained to [Rocheux] the particular defects Defendants were experiencing, that Defendants could not use the defective material, and that Defendants did not want the unusable plastic." (*Id.* ¶ 11.) Mr. Margaros further generally asserts that, during the course of the parties' business relationship, Defendants set aside the defective plastic for a brief period before disposal so that Rocheux could inspect the product, but that Rocheux typically did not come for inspection. (Margaros Decl. ¶ 11 ("On each such occasion . . . . I asked [Rocheux] to come . . . to look at the defective and nonconforming Rocheux plastic. I also told them that the material would be set aside . . . for a short time in case they wanted to look at it. On many occasions they said [a Rocheux representative] would come by and look at the plastic, but he only came by on two or three occasions and generally did not do so.").) Mr. Margaros also states that, when Rocheux did not come to inspect goods, Defendants sold the defective goods as scrap. (*See id.*) He further contends that Rocheux representatives did not provide instructions regarding the defective materials, but that Rocheux "always and repeatedly assured that Defendants would receive credits to their account for any and all defective and/or nonconforming material." (*Id.* ¶¶ 11–12.)

For its part, Rocheux claims that it was not notified of problems with the 2006 deliveries until its president received an email from Defendants' president on September 6, 2006.  (Steed Decl. Ex. D (Sept. 6, 2006 email from Jeffrie Green to Wendy Steed) (indicating that "there have been some problems with the materials which Rocheux supplied," and inquiring whether "[Rocheux's] other customers encountered sealing problems").)  Prior to the September 6 email, Rocheux claims that Defendants had generally acknowledged that they owed payments for the 2006 deliveries.  Rocheux's sales representative Michael Flood, who handled Defendants' account since 2000, contends that, with the exception of a handful of instances where Rocheux issued credits for "minor discrepancies in the quantity or weight of goods delivered [to Defendants]," Defendants never complained about the quality of goods delivered by Rocheux during the course of the parties' relationship.  (Flood Decl. ¶ 5.)  Mr. Flood further states that Defendants never rejected or otherwise indicated that they did not want to keep the 2006 deliveries (Flood Decl. ¶ 6), noting that, if they had, Rocheux would have requested an opportunity to inspect the goods, and that Rocheux would have returned any defective goods to the original manufacturer for credits (Flood Decl. ¶ 7).  To support this claim, Rocheux notes that its representatives met with Defendants' president in California on three occasions: April 1, 2006 (Ms. Steed, Rocheux's president), May 31, 2006 (Mr. Stephanoff, Rocheux's vice president and COO), and July 17, 2006 (Ms. Steed, Mr. Flood, and Thompson Yeh, Rocheux's vice president of the Rigid Plastics Division).  According to these representatives, Defendants never expressed any concerns with the 2006 deliveries at these meetings, and Defendants' president acknowledged that Defendants owed the amounts listed in Rocheux's invoices, but that the delay in payments for the 2006 deliveries was attributable to problems with Defendants' new

accounting software.  (Steed Decl. ¶¶ 5–6, 8; Stephanoff Decl. ¶¶ 22–23; Yeh Decl. ¶¶ 8–9.)

After Ms. Steed received the September 6 email, she replied the following day with an email asking Mr. Green to "please provide [Rocheux] full details" regarding his assertion of defects with delivered goods.  (Steed Decl. Ex. E (Sept. 7, 2006 email from Wendy Steed to Jeffrie Green).)  Her response further asserted "We stand behind our product and will send a team to investigate any problems you may be having with our material.  Any defective materials should be returned for a full credit."  (*Id.*)  Ms. Steed asserts that Defendants never responded to her request for inspection or return of defective goods.  (Steed Decl. ¶ 13.)  Defendants concede that "the vast majority" of the 2006 deliveries had been discarded as scrap when they received Ms. Steed's September 7, 2006 email requesting the return or inspection of defective goods.  (Margaros Decl. ¶ 15.)  More than a year later, the parties met at Defendants' plant in California in November 2007 for an inspection of the defective goods Defendants still possessed.  Defendants produced 33 rolls of plastic, "most of which, if not all, of which [we]re not part of the [2006 deliveries]."  (Stephanoff Decl. ¶ 7; *see also* Margaros Decl. ¶ 15.)

The parties also dispute the applicability of additional terms for interest and attorneys' fees that Rocheux asserts it included in both its order confirmations and invoices to Defendants.  (*See* Pl.'s 56.1 Statement ¶ 257; Defs.' 56.1 Resp. ¶ 257.)  Rocheux's Supervisor of Customer Service Donna McRavin attests that Rocheux, by virtue of its document-producing software, automatically included a "Terms and Conditions" page as page 2 of every order acknowledgment it sent to Defendants in response to Defendants' purchase orders.  (McRavin Decl. ¶ 11.)  Paragraph 7 of the Terms and Conditions page provides for a service charge of 1.5% per month on "all . . . outstanding charges and invoices," and states that the purchaser will be responsible

for "all costs and expenses of collection, including reasonable attorneys' fees of 25% of the outstanding balance, incurred by Rocheux in connection with [the parties' sales contracts] or in any action or proceeding against Customer for breach of [the parties' sales contracts]." (*E.g.*, McRavin Decl. Ex. F.)  Ms. McRavin included order confirmations containing Terms and Conditions pages for the 2005–2006 purchase orders.  (*See* McRavin Decl. Exs. A–TTTTTTTT.)

In addition to the Terms and Conditions pages Rocheux contends it included with the order confirmations, Rocheux asserts that it sent Defendants invoices after each delivery that contained essentially the same additional terms.  (Pl.'s 56.1 Statement ¶¶ 258, 260.)  A footnote in the invoices provides that "[d]elinquent accounts are subject to a service charge of 1.5% per month" and notifies the purchaser that it will be responsible for costs and "reasonable attorney's fees" if Rocheux has to institute legal proceedings to collect under the parties' sales contracts. (*E.g.*, McRavin Decl. Ex. K.)  Ms. McRavin included the invoices for the 2005–2006 purchase orders.  (*See* McRavin Decl. Exs. A–TTTTTTTT.)  Defendants deny that they ever received Terms and Conditions pages with the order confirmations that Rocheux sent.  (Green Decl. ¶ 14; Oprisan Decl. ¶¶ 6–7.)  According to Mr. Green, Defendants' president and CEO, he arranged Defendants' initial agreement to purchase plastics from Rocheux in a conversation or series of conversations with Rocheux salesman Mike Flood, ostensibly in or about 2000.  (Green Decl. ¶¶ 10–11.)  Mr. Green attests that his companies only purchase plastic materials "from suppliers [he] approve[s], on terms that [he] negotiate[s]," and that his companies "do not accept additional terms and conditions from [their] vendors."  (*Id.* ¶ 11.)  Mr. Green further alleges that he discussed these limitations with Mr. Flood when they first met, and that Mr. Flood "agreed that if we did business, it would be on the terms that I outlined."  (*Id.*)  Mr. Green denies being

apprised of the additional terms for interest and attorneys' fees now sought by Rocheux at any point in the parties' business relationship, and Mr. Green further contends that, prior to the instant litigation, Rocheux never attempted to charge Defendants interest or attorneys' fees on past-due invoices.  (*Id.* ¶¶ 14–15.)  Defendants do not deny receiving invoices containing terms for interest and attorneys' fees,[1] but Defendants contest the legal significance of these invoices.

### C.  Procedural History

On December 21, 2006, Rocheux filed a six-count Complaint presenting claims for breach of contract (Counts I, V), claims on book accounts (Counts II, VI), unjust enrichment (Count III), and conversion of property (Count IV).  Counts I–IV seek damages for the 2006 deliveries, and Counts V–VI seek damages for the warehouse goods.  Defendants filed an Answer on February 28, 2007, that denied most of the allegations supporting Rocheux's claims and asserted a number of affirmative defenses, including that Rocheux's claims were barred by Rocheux's prior breach of contract, failure to supply conforming goods of merchantable quality, and breach of express and implied warranties.  (Answer, Affirmative Defenses IV, VIII, IX.)  Rocheux now moves for summary judgment on its claims for the 2006 deliveries and warehouse goods, seeking $4,635,761.18 in damages, interest, attorneys' fees, and costs.[2]  Defendants oppose Rocheux's motion in its entirety, and cross-move: (1) to redesignate certain affirmative

---

[1]Indeed, the invoices attached to Ms. McRavin's Declaration bear Defendants' bates stamp. (*E.g.*, McRavin Decl. Ex. K.)

[2]Rocheux's damages calculation consists of $2,116,571.76 in damages for the 2006 deliveries, $387,699.70 for the deficiency related to the resale of the warehouse goods, and $18,562.36 and $56,622.67 in freight and storage charges related to the resale of the warehouse goods.  (Pl.'s Br. at 5–6.)  According to the Declaration of Mr. Stephanoff and its accompanying Exhibit A, Rocheux seeks $2,056,304.68 in interest on the 2006 deliveries and warehouse goods as of May 31, 2010.

defenses as counterclaims pursuant to Federal Rule of Civil Procedure 8(c); (2) to estop Rocheux from receiving the full contract price of the 2006 deliveries on the basis of Rocheux's promises of credits for nonconforming goods; (3) for summary judgment on Rocheux's claims for the warehouse goods; and (4) for summary judgment under UCC § 2-207 on the additional terms for interest and attorneys' fees.  In addition to the parties' cross-motions for summary judgment, Rocheux moves pursuant to Federal Rules of Evidence 702 and 703 to exclude the testimony of Defendants' proffered expert witnesses Arthur Buckle, Nick Margaros, and Barbara Luna.

## II.   MOTION TO REDESIGNATE AFFIRMATIVE DEFENSES

The Court first considers Defendants' request to redesignate certain affirmative defenses as counterclaims pursuant to Federal Rule of Civil Procedure 8(c)(2).  This Rule provides in pertinent part: "If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so."  Fed. R. Civ. P. 8(c)(2).  Defendants intend to rely on their affirmative defenses of breach of warranty and breach of contract to seek offsets from any amount due under its contracts with Rocheux on the basis of Rocheux's failure to provide conforming goods between 2000 and 2006.  According to Defendants, towards the beginning of the their business relationship, Rocheux expressly warranted that it would give Defendants the best prices on for all purchases and that it would always deliver "first quality virgin grade (non-recycled) material."  (Defs.' Cross-Motion Br. at 4–5; Green Decl. ¶¶ 11–12.) Defendants allege that, in addition to shipping a substantial amount of unusable plastic, Rocheux also sold and delivered goods that did not conform to the "best-pricing" and "virgin-grade" warranties.  Rocheux objects to Defendants' proposed counterclaims on the grounds that

Defendants' requested modification would alter the "essential character" of the affirmative defenses by including "new counterclaim[s] that w[ere] not the subject of the complaint or the answer."  (Pl.'s Reply Br. at 26–27.)  The question before the Court, then, is whether Defendants' proposed modification redresses a simple mistaken designation, for which Rule 8(c)(2) provides the appropriate standard for relief, or whether Defendants' modification presents a new claim, for which leave to amend is governed by Federal Rule of Civil Procedure 15(a)(2).  *See Bozsi Ltd. P'ship v. Lynott*, 676 F. Supp. 505, 515–16 (S.D.N.Y. 1987) (differentiating between "technical pleading error[s]," to which Rule 8(c) applies, and redesignations that would "alter[] the essential character of a case"); Wright & Miller, 5 Federal Practice & Procedure § 1275 (West 2010) ("The misdesignation provision in Rule 8(c) reflects the conscious attempt by the draftsmen to ignore pleading technicalities; it also promotes the liberality with which courts generally construe pleadings under the federal rules.").  Consequently, the parties' pleadings provides the appropriate frame of reference.

Rocheux's Complaint alleges that Defendants breached contractual obligations to pay for goods delivered between January and June 2006.  (Compl. ¶ 21.)  Indeed, the Complaint generally avers that the parties had a business relationship prior to this time.  (Compl. ¶¶ 12 (alleging that Defendants had purchased materials from Rocheux "[f]or the last several years," and that Rocheux "sought information concerning Defendants' creditworthiness" in 2004), 17 (alleging that the parties entered into a written agreement for the supply of G/A/G in March of 2005), 19 (asserting that Defendants made orders for PVC and G/A/G in 2005 and 2006).)  However, the Complaint only alleges that Defendants breached contractual obligations to pay for

goods delivered between January and June 2006.  It does not specify an earlier period of breach.[3]
Defendants' Answer denied the allegation of breaches occurring between January and June 2006
and asserted that Rocheux breached its contractual obligations.  (Answer ¶ 21.)  The affirmative
defenses Defendants presently seek to redesignate as counterclaims state that "Rocheux's claims
are barred, in whole or in part," by Rocheux's breach of contract, by Rocheux's "failure to
provide conforming goods of merchantable quality," and by Rocheux's "breaches of express and
implied warranties."  (*Id.*, Affirmative Defenses IV, VIII, IX.)  Nowhere in the Answer do
Defendants seek relief for nonconforming goods delivered between 2000 and 2005.  During oral
argument, Defendants argued that the pleadings opened the door for Defendants to claim offsets
for nonconforming goods delivered during the parties' entire business relationship, because the
parties' contractual agreement was an installment contract.  However, this understanding of the
parties' relationship is not reflected in the pleadings, and even if the parties had an installment
contract relationship, Defendants did not allege that nonconformities occurred prior to the 2006
deliveries.[4]

The pleadings thus unequivocally demonstrate that the parties' dispute concerned goods
delivered between January and June 2006, as well as warehouse goods billed in September 2006.

---

[3]The Complaint also contains a claim for breach of contract related to the warehouse
goods.  (Compl. Count V.)  It appears that the alleged breach underpinning this Count took place
in or about September 2006.  (Compl. ¶ 40.)

[4]Defendants' theory appears to be that, because the UCC permits installment contract
buyers to recoup damages for nonconformities, *see* UCC § 2-717, then they could withhold sums
for nonconformities that occurred during prior years' deliveries.  While that may be true,
Defendants did not plead a recoupment defense, and, as the Court explains *infra* note 10,
Defendants have not presented evidence that they actually did withhold specific sums as
recoupment for nonconformities occurring with specific deliveries.

The plausibility standard imposed by Federal Rule of Civil Procedure 8(a), *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) *and Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which applies to counterclaims, *see* Fed. R. Civ. P. 8(a) (2007) *and* 2007 amendment note (noting "stylistic changes"), persuades this Court that Defendants' generic affirmative defenses did not expand the temporal scope of the legal claims.  Therefore, Defendants' purported modification seeking offsets on the basis of nonconforming goods delivered between 2000 and 2005 is properly characterized as a motion to amend their Answer to include new counterclaims.

Federal Rule of Civil Procedure 15(a)(2) provides that, under the present circumstances, "a party may amend [its] pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  This standard applies to affirmative and responsive pleadings alike.  *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004).  The Supreme Court identified several factors that guide the application of this Rule in *Foman v. Davis*:

> If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. 178, 182 (1962); *see also Arthur v. Maersk, Inc.*, 434 F.3d 196, 204–05 (3d Cir. 2006).  The Third Circuit has explained that "[d]elay alone is not sufficient to justify denial of leave to amend."  *Arthur*, 434 F.3d at 204; *see also Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984). "[H]owever, at some point, the delay will become 'undue,'

placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984). "The question of undue delay, as well as the question of bad faith, requires that [the court] focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants." *Id.*; *see also Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). It is well established in this Circuit that "prejudice to the non-moving party is the touchstone for the denial of an amendment," *e.g.*, *Arthur*, 434 F.3d at 204, but "the longer the unexplained delay, the less the [non-moving party] must show in terms of prejudice" to defeat the motion to amend, *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Rocheux argues that Defendants' motion to redesignate should be denied because of undue delay, prejudice, and futility.

With regard to delay, the undisputed record demonstrates that Defendants did not seek to add the proposed counterclaims until it opposed Rocheux's motion for summary judgment on April 16, 2010, more than three years after they filed their Answer on February 28, 2007, and more than 16 months after the close of discovery on November 28, 2008. (*See* Doc. No. 41 (July 29, 2008 Revised Scheduling Order).) Furthermore, based on Defendants' representation that their answers to interrogatories notified Rocheux as early as August 2007 that they intended to seek offsets for nonconforming goods delivered before January 2006 (*see* Defs.' Cross-Motion Br. at 16–17), the Court may deduce that Defendants *knew* of their potential counterclaims in August 2007, more than 30 months prior to moving to include these counterclaims. Other than arguing their understanding that the parties' installment contract opened the door for offsets in

prior years, Defendants did not provide an explanation for their delay in seeking redesignation in either their motion briefs or during oral argument. As noted above, Defendants' unpled understanding regarding the parties' installment contract did not expand the scope of the pleadings, and the Court does not find that Defendants were justified in believing that it did. As the Court notes below, Defendants' purported redesignation would drastically change the scope of the claims before the Court. Defendants' delay in presenting these counterclaims has been substantial, and because Defendants have not provided a satisfactory explanation, the Court finds Defendants' delay undue. *See, e.g.*, *In re Madera*, 586 F.3d 228, 234 (3d Cir. 2009) (finding motion to amend "untimely" where the party waited until its adversary's motion for summary judgment to seek leave to amend, and the proposed claims "[we]re not based on evidence that came to light after discovery").

It further appears that Rocheux would suffer prejudice by such a dramatic expansion of the pleadings at this late stage of the game. According to the findings of Defendants' damages expert Dr. Barbara Luna, Defendants seek offsets from Rocheux's invoices in the amount of $1,917,432 (more than $2 million with interest). (McAlindin Certif., Ex. C ("Luna Report") at 11.) Of this total offset amount, only a small portion (less than 15%) relates to alleged nonconformities with the 2006 deliveries that are the subject of Rocheux's Complaint. (*See id.* scheds. 2 (approximately $147,000 offset for lost material in 2006), 3 (approximately $51,000 offset for improper pricing in 2006), 4 (approximately $33,000 offset for goods quality in 2006), 6 (approximately $10,000 offset for lost material, improper pricing, and goods quality for deliveries missing invoices in 2006).) Thus, notwithstanding defense counsel's characterization of the proposed redesignation, it appears that Defendants seek to pursue claims that, for the most

15

part, differ from the 2006 deliveries and warehoused goods that were the subject of the pleadings. Rocheux's counsel asserts that he did not know that Defendants would seek nearly $2 million in offsets for goods delivered between 2000 and 2005 until he was served with Dr. Luna's Report on October 1, 2008, after the close of fact discovery on August 29, 2008.  (Pl.'s Reply Br. at 28.) Because fact discovery had already closed, Rocheux's counsel contends that he was deprived of an opportunity to request documents and conduct supplemental depositions related to Defendants' allegations about the nonconforming goods delivered between 2000 and 2005 and Rocheux's promises of credits.  (Pl.'s Reply Br. at 28; McAlindin Decl. ¶¶ 15.)

Defendants respond that their answers to interrogatories in 2007 and 2008 timely notified Rocheux of their intent to seek offsets for nonconforming goods delivered before 2006.[5]  (Defs.' Cross-Motion Br. at 16–17.)  Yet, the interrogatory answers upon which Defendants rely do not expressly indicate that Defendants would present counterclaims for delivery of nonconforming goods before 2006.  The only answer that *could* be read to encompass such goods was Defendants' amended answer to interrogatory number 5, which asserts that "defects occurred at various times throughout the business relationship" (*see* McAlindin Cert. Ex. C), but this response does not expressly notify Rocheux of Defendants' intent to expand the temporal scope of the action.  However, even if Rocheux had some notice that Defendants would seek offsets on

---

[5]Defendants also argue that Rocheux had an opportunity to depose Dr. Luna regarding her calculation of offsets for nonconforming goods delivered between 2000 and 2005.  (Defs.' Cross-Motion at 18.)  The Court notes, however, that this deposition did not take place until October 2009, well after the close of discovery in November 2008, and the deposition transcript suggests that Dr. Luna's testimony on these damages came as a surprise to Plaintiff's counsel.  (*See* McAlindin Certif. Ex. D (Luna Deposition) at 87–88.)  Because Dr. Luna is not a fact witness, but a damages expert who relies upon the factual allegations of Defendants' fact witnesses, this argument does not address Rocheux's claim that it was deprived of an opportunity to conduct discovery on Defendants' proposed counterclaims.

the basis of goods delivered between 2000 and 2005 prior to the close of discovery, it was still prejudiced by the fact that it did not have fair notice of the factual and legal bases of Defendants' proposed counterclaims until it received Defendants' cross-motion.  By that point, Rocheux's counsel had already expended significant resources in preparing Rocheux's motion for summary judgment.  Although Plaintiff's summary judgment brief demonstrates an attempt to forecast and counter Defendants' proposed counterclaims (*see, e.g.*, Pl.'s Br. at 22 n.4), Rocheux was deprived of an opportunity to address these counterclaims head-on.  At this late stage, such a substantial amendment to Defendants' pleadings would unduly prejudice Rocheux.

Although substantial delay and prejudice alone warrant denying Defendants' motion to redesignate, the Court also notes that Defendants' proposed counterclaims appear to be time-barred.  New Jersey law provides a four-year limitations period for contract and warranty claims arising under New Jersey's Uniform Commercial Code (UCC) provisions.  N.J. Stat. Ann. § 12A:2-725; *see also Spring Motors Distrib., Inc. v. Ford Motor Co.*, 98 N.J. 555, 561 (1985) (explaining that the UCC's four-year statute of limitations applies to breach of warranty claims brought by "a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods").  This provision states that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach," but notes that "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  N.J. Stat. Ann. § 12A:2-725(2).  Section 12A:2-725(2) thus operates as an exception to the general discovery rule.  *See, e.g.*, *South Jersey Gas Co. v. Mueller Co., Ltd.*, No.

17

09-4194, 2010 WL 1742542, at *5 (D.N.J. Apr. 27, 2010).  Here, Defendants' purported

counterclaims for breach of warranty (i.e., the "best-price" and "virgin-grade" warranties) do not

rely on a warranty regarding future performance.  *Cf. Comm'rs of Fire Dist. No. 9 v. Am. La*

*France*, 176 N.J. Super. 566, 573 (App. Div. 1980) ("The key requirement in finding a warranty

of future performance is that it makes specific reference to a future time here, a period of at least

one year. This type of warranty cannot be characterized as a mere representation of the product's

condition at the time of delivery . . . ."); *see also South Jersey Gas*, 2010 WL 1742542, at *5.

Therefore, Defendants' cause of action for breach of warranty "occur[red] when tender of

delivery [was] made."  N.J. Stat. Ann. § 12A:2-725(2).  Defendants did not seek to include

counterclaims for nonconforming goods sold and delivered before 2006 until they filed the

instant cross-motion on April 16, 2010, more than four years after the tender of delivery of any

such goods.  Defendants have provided no legal or equitable reason why the statute of limitations

should be tolled for these counterclaims.  Because Defendants' proposed counterclaims appear to

be time-barred, redesignation would be futile.  *See, e.g.*, *Arab African Int'l Bank v. Epstein*, 10

F.3d 168, 174–75 (3d Cir. 1993) (affirming district court's denial of leave to amend on the

grounds of futility where the proposed claim was time-barred).

        The Court will permit Defendants to redesignate Affirmative Defenses IV, VIII, and IX as

counterclaims to seek offsets related to the goods that are the subject of Rocheux's Complaint

and Defendants' Answer: goods delivered between January 2006 and June 2006.[6]  However, to

the extent that Defendants' cross-motion attempts to expand these Affirmative Defenses into

---

        [6]The warehouse goods are not included in this group, because it is undisputed that these
goods were never delivered to Defendants, and Defendants have raised a distinct defense to
liability for these goods.

counterclaims seeking offsets for goods delivered before 2006, the Court will deny Defendants'

motion on the grounds of undue delay, prejudice, and futility.

## III.    SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*,

789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)

(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict in its favor).  An issue is "genuine" if a reasonable jury could

possibly hold in the nonmovant's favor with regard to that issue.  *Id.*

The substantive law identifies which facts are "material."  *Anderson*, 477 U.S. at 247–48.

Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  In deciding

whether triable issues of fact exist, the court must view the underlying facts and draw all

reasonable inferences in the light most favorable to the non-moving party.  *Matsushita*, 475 U.S.

at 587; *see also Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The court may not resolve factual disputes or make credibility determinations at the summary

judgment stage.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.

1992).  However, "if the non-movant's evidence on any essential element of the claims asserted

is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment

in favor of the moving party." *Peterson v. AT&T*, No. 99-4982, 2004 WL 190295, at *3 (D.N.J.

Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).  To present a genuine issue of material fact,

the summary judgment opponent "'need not match, item for item, each piece of evidence

proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA*

*Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also*

*Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the

[nonmovant's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmovant].").

   With the present case, both parties present multiple theories in favor of or against

summary judgment with regard to two distinct sets of goods (2006 deliveries and warehouse

goods) and the disputed interest and attorneys' fees provisions Rocheux claims were part of their

contracts with Defendants.  Accordingly, the Court will assess the parties' arguments as they

relate to these disputed claims, shifting the summary judgment standard as necessary to account

for the arguments raised on cross-motion.  Rocheux contends, and Defendants do not dispute,

that New Jersey law applies to this action.  Accordingly, the Court will apply New Jersey law to

the claims at issue in these motions.  *See, e.g.*, *Am. Cyanamid v. Fermenta Animal Health Co.*, 54

F.3d 177, 180 (3d Cir. 1995).  Because this case involves the application of New Jersey's UCC

provisions, this Court may consult the decisions of other courts that have applied their state's

UCC provisions to the extent that such decisions are persuasive and do not conflict with the

decisions of New Jersey courts.  *Green Constr. Co. v. First Indem. of Am. Ins. Co.*,735 F. Supp.

1254, 1260 & n.2 (D.N.J. 1990); *see also Menichini v. Grant*, 995 F.2d 1224, 1229 (3d Cir.

1993) (applying Pennsylvania law).  This Court has diversity jurisdiction pursuant to 28 U.S.C.

§ 1332(a) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

### A. 2006 Deliveries

Rocheux argues that Defendants are liable for the purchase price of the 2006 deliveries because (1) Defendants accepted the goods; (2) Defendants violated N.J. Stat. Ann. §§ 12A:2-515 and 12A:2-603 because they resold the goods without notifying Rocheux and failed to credit Rocheux's account; and (3) Defendants have stated an account in favor of Rocheux.  Defendants respond (1) that Rocheux is estopped from obtaining judgment for the 2006 deliveries; (2) that Defendants have presented evidence creating a genuine issue of fact regarding whether Defendants rejected or revoked acceptance of a portion of the 2006 deliveries;[7] (3) that Defendants have presented evidence that they exercised their right under N.J. Stat. Ann. § 12A:2-717 to withhold offsets for nonconforming goods; (4) that §§12A:2-515 and 12A:2-603 do not apply to the facts of this case; and (5) that Rocheux's account stated claim is procedurally improper and subject to genuine issues of fact.  Of Defendants arguments, only the first appears to seek affirmative relief on an affirmative defense via cross-motion, and the remainder appear to oppose Rocheux's arguments in favor of summary judgment.  Accordingly, the Court will begin with Defendants' estoppel affirmative defense, and shift the summary judgment burdens to treat

---

[7]The Court notes that Defendants have also presented a counterclaim for breach of warranties seeking offsets on the basis that portions of the 2006 deliveries did not conform to Rocheux's alleged "best-pricing" and "virgin-grade" warranties.  However, these purported offsets for breach of warranty do not preclude consideration of Plaintiff's claim for the contract price of the goods.  *See, e.g., Phibro Animal Health U.S., Inc. v. Cornerstone AG Prods.*, 271 F. App'x 214, 215–16 (3d Cir. 2008); *Electro-Catheter Corp. v. Surgical Specialties Instrument Co., Inc.*, 587 F. Supp. 1446, 1456–57 (D.N.J. 1984).

Rocheux as the non-moving party, before considering Rocheux's arguments.

### 1. Defendants' Estoppel Affirmative Defense

Defendants argue that the undisputed record demonstrates that Rocheux's representatives repeatedly made promises to give Defendants credits for nonconforming goods throughout the course of the parties' relationship, promises upon which Defendants relied by continuing to purchase plastic from Rocheux, but that Rocheux never delivered on these promises. Accordingly, Defendants argue that Rocheux's promises estop them from seeking the full contract price on the 2006 deliveries.

Before the Court assesses Defendants' arguments, the Court notes that Defendants did not plead an estoppel counterclaim for promises of credits made on deliveries prior to 2006. Nor do Defendants seek to redesignate their estoppel affirmative defense as a counterclaim. Thus, the Court limits Defendants' estoppel affirmative defense to promises of credits made on the 2006 deliveries in accordance with this Court's ruling on Defendants' cross-motion to redesignate affirmative defenses.

Defendants invoke the doctrines of both promissory estoppel and equitable estoppel. In New Jersey, promissory estoppel consists of: "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise[;] and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise." *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 479 (App. Div. 1978); *see also Watson v. City of Salem*, 934 F. Supp. 643, 661 (D.N.J. 1995). Similarly, equitable estoppel consists of "(1) a representation (or misrepresentation); (2) knowledge, by the representor, that a

22

second person is acting on the basis of the representation; and (3) substantial detrimental reliance by the second person on the representation." *Panzino v. Scott Paper Co.*, 685 F. Supp. 458, 460 (D.N.J. 1988); *see also Atlantic City Housing Auth. v. State of New Jersey*, 188 N.J. Super. 145, 149 (App. Div. 1983).  Rocheux argues that Defendants have failed to present evidence establishing a prima facie case for either promissory of equitable estoppel, because Defendants have not identified "any details or evidence of Rocheux's promises, or how much the discounts were supposed to be, what the formula [for discounts] was, or what factors determined what the discount was."  (Pl.'s Reply Br. at 25.)  The Court agrees.

The only evidence relied upon by Defendants to establish that Rocheux made promises of credits is the declaration of Mr. Margaros, their thermoforming manager.  (Defs.' Cross-Motion Br. at 36.)  While Mr. Margaros's Declaration generally asserts that Rocheux representatives "always and repeatedly assured that Defendants would receive credits to their account for any and all defective and/or nonconforming material" whenever he notified them of problems with the goods (Margaros Decl. ¶ 12), it does not provide any details regarding when these promises were made, to which deliveries they applied, or the extent of the promised credit for the alleged defects.  The Court cannot determine from these vague statements that Rocheux made definite representations regarding the 2006 deliveries, as opposed to prior deliveries not the subject of this suit, or that Defendants' reliance was reasonable and the detrimental impact substantial.  As the moving party with respect to this affirmative defense, Defendants must satisfy the burden of production by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which [they] believe[] demonstrate the absence of a genuine issue of material fact."  *See Celotex*, 477 U.S. at 323; Fed.

23

R. Civ. P. 56(c).  Defendants have not met this burden.[8]  Accordingly, the Court will deny Defendants' cross-motion to the extent that it seeks summary judgment on its affirmative defense of estoppel, and the Court will consider Rocheux's arguments for summary judgment on the 2006 deliveries.

### 2. Rocheux's Contract and Account Stated Claims

As noted above, Rocheux has presented three primary arguments in favor of summary judgment on the 2006 deliveries: (1) Defendants' acceptance of the goods; (2) Defendants' non-compliance with N.J. Stat. Ann. §§ 12A:2-515 and 12A:2-603, which in certain circumstances require a buyer to keep nonconforming goods for inspection and sell nonconforming goods for the seller's account; and (3) Defendants have stated an account in favor of Rocheux.  The Court considers each argument in turn.

With regard to Rocheux's argument that Defendants accepted the 2006 deliveries, it is undisputed that Rocheux made deliveries related to the 2005–2006 purchase orders (purchase orders no. 21920, 22190, 22897, P13295, P13300, P13302, 20188, 20491, 20564, 20583, and 22488) between January and June 2006, and that Rocheux sent Defendants invoices for these deliveries.  (Pl.'s 56.1 Statement ¶¶ 1, 2, 6; Defs.' 56.1 Resp. ¶¶ 1,2, 6.)  It is undisputed that Defendants did not pay for the 2006 deliveries and that Defendants no longer possess the goods

---

[8]Even if Defendants had satisfied the burden of production, it does not appear that their estoppel affirmative defense would preclude the entry of judgment on the portion of goods that Defendants concede they accepted.  *See infra* Part III.A.2.  Because Defendants seek to estop Rocheux from collecting the full contract price on the 2006 deliveries, their estoppel affirmative defense resembles Defendants' other counterclaims seeking offsets.  However, as this Court has previously noted, *see supra* note 7, the availability of offsets does not preclude summary judgment on an otherwise undisputed contract claim.  *See, e.g.*, *Phibro*, 271 F. App'x 215–16; *Electro-Catheter Corp.*, 587 F. Supp. at 1456–57.

from the 2006 deliveries.  (Pl.'s 56.1 Statement ¶¶ 8, 12; Defs.' 56.1 Resp. ¶¶ 8, 12.)  Although

Defendants dispute their liability for the 2006 deliveries, they do not dispute Rocheux's assertion

that the outstanding balance for the 2006 deliveries is $2,116,571.76.  (Pl.'s 56.1 Statement ¶ 9;

Stephanoff Decl. ¶ 32 & Ex. A; Defs.' 56.1 Resp. ¶ 9.)

    Under the UCC, the buyer has the following options with regard to delivery of

nonconforming goods: "(a) reject the whole; or (b) accept the whole; or (c) accept any

commercial unit or units and reject the rest."  N.J. Stat. Ann. § 12A:2-601.[9]  "The buyer must pay

at the contract rate for any goods accepted."  N.J. Stat. Ann. § 12A:607(1).  Thus, the question

before the Court is whether Defendants accepted the goods.  Defendants contend that they have

presented evidence that they rejected or revoked portions of the 2006 deliveries, which would

make summary judgment improper.[10]  However, Defendants concede that they accepted some of

---

[9]The Court notes that, in addition to the buyer's options provided by § 2-601, § 2-612 provides an additional option for buyers who have purchased via an installment contract: "[t]he buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured or if the non-conformity is a defect in the required documents . . . ."  N.J. Stat. Ann. § 12A:2-612(2).  Although Defendants argue that the parties' transactions constituted a series of installment contracts (Defs.' Br. at 65–67), Defendants do not argue that they rejected an installment for nonconformities that substantially impaired the value of the installment.

[10]Alternatively, Defendants contend that summary judgment cannot be granted because they have presented evidence that they exercised their right under N.J. Stat. Ann. § 12A:2-717 to recoup damages caused by the nonconformities.  However, Defendants did not plead a defense on the basis of recoupment, and even if they did, Defendants' only purported evidence regarding recoupment—the declaration of their accounting representative Catalin Oprisan (*see* Defs.' Cross-Motion Br. at 68)—does not indicate that Defendants *actually did* withhold payment for nonconforming goods, let alone when Defendants withheld payment, how much Defendants withheld, for which deliveries payments were withheld, and when Defendants notified Rocheux of its election to recoup payment for nonconforming goods.  (*See* Oprisan Decl. ¶ 4 (explaining that, "on a number of occasions between 2000 and the end of 2006," Rocheux promised credits for nonconforming goods, to which Mr. Oprisan responded "the amounts of the credits needed to be worked out," also telling Rocheux's representatives "that some amount would be held back

the 2006 deliveries.  (Defs.' Cross-Motion Br. at 42–43 ("[S]ome of the nonconforming goods,

*i.e.* plastic that was not first quality virgin grade (non-recycled) material but otherwise free of

defects, was processed into usable parts that passed Defendants' quality inspection and was sold.

This material was accepted and Defendants maintain their claim to offset any amounts allegedly

owed due to Plaintiff's breaches of warranties.").)  Defense counsel stood by this concession

during oral argument, though he characterized the accepted goods to be a small portion of the

2006 deliveries.  (Oral Argument Tr. at 40.)  Because "[a]cceptance of a part of any commercial

unit is acceptance of that entire unit," N.J. Stat. Ann. § 12A:2-606(2), the Court narrows its focus

to how many commercial units Defendants accepted.

    The UCC defines "commercial unit" as:

> such a unit of goods as by commercial usage is a single whole for
> purposes of sale and division of which materially impairs its character or
> value on the market or in use.  A commercial unit may be a single article
> (as a machine) or a set of articles (as a suit of furniture or an assortment
> of sizes) or a quantity (as a bale, gross, or carload) or any other unit
> treated in use or in the relevant market as a single whole.

N.J. Stat. Ann. § 12A:2-105(6).  The record in this case demonstrates that the plastic was priced

and ordered by the pound.  (*See, e.g.*, McRavin Decl. Ex. E (purchase order).)  Although the

Court has not located New Jersey case law using goods' weight as the commercial unit, other

---

until the credits were resolved and that payments which were made would be made on account
and subject to further adjustment for the credits").)  Defense counsel did not fill in these
evidentiary gaps during oral argument, but instead relied on conclusory assertions of their
statutory right to recoupment.  (Oral Argument Tr. at 38–39.)  Furthermore, Defendants do not
suggest that, due to other nonconformities, they intentionally withheld any sums related to the
portion of the 2006 deliveries that they used, sold, and, thereby, accepted.

    In the absence of colorable evidence on this issue, Defendants have not established a
genuine issue of fact regarding recoupment that would preclude summary judgment on the
contract price for goods they concede they accepted.

courts have applied their state's UCC provisions in such a manner.  *See, e.g.*, *Figueroa v. Kit-San Co.*, 845 P.2d 567, 577–78 (Idaho Ct. App. 1992) (finding that the commercial unit was a ton of betonite where the betonite was priced by the ton); *Askco Eng'g Corp. v. Mobil Chem. Corp.*, 535 S.W.2d 893, 896 (Tex. Civ. App. 1976) (finding that commercial unit was a pound of film where the film was priced by the pound).  The Court finds these rulings persuasive and will adopt a pound of plastic as the commercial unit for this case.

Defendants do not identify how much of the 2006 deliveries they were able to use, but assert that Dr. Luna's expert report[11] explains how much of the 2006 deliveries they rejected because the product was unusable.  (Defs.' Cross-Motion Br. at 39, 43.)  Assuming *arguendo* the validity of Dr. Luna's calculations, and applying this Court's ruling with regard to the scope of Defendants' redesignated counterclaims, it would appear that Defendants report losses (i.e., unusable plastic)[12] in 2006 of $147,320.32 (Luna Report sched. 2 revised) and $6,398.03 (*id.* sched. 6 revised).  Thus, of the $2,116,571.76 that Rocheux seeks for the 2006 deliveries, based on Defendants' numbers it appears that Defendants dispute only $153,718.35 worth of product (approximately 7 %), and Defendants do not dispute that they used, or accepted, the remaining $1,962,853.41.

However, there are two problems with relying on this deduction to determine the

---

[11]It appears that Dr. Luna's calculation of "loss" offsets are based upon Defendants' business records regarding the amount of material that was unusable.  (*See* Luna Report sched. 7.2 n.1 (indicating that U.S. Merchants provided the write-off schedule).)

[12]For purposes of determining the amount of goods Defendants accepted, the Court adopts Defendants' distinction between nonconforming goods that they used and sold and the nonconforming goods that they could not use, which Dr. Luna refers to as "losses."  Accordingly, when the Court refers to Defendants' losses in this section, the Court means the portion of the 2006 deliveries that Defendants used and sold, regardless of nonconformities.

proportion of the 2006 deliveries that Defendants accepted.  First, Defendants' asserted offsets appear to be based on value and not the commercial unit (pounds of plastic).  Second, Dr. Luna applied an estimated "loss percentage" of 8.99% to calculate offsets due to unusable material. Dr. Luna determined this estimated loss percentage by dividing Defendants' total loss write-offs from 2000 through January 2006 by the total product delivered during the same period.  (*Id.* at 7–8.)  Although this approach appears reasonable at first blush, it obscures the fact that Defendants have not presented records for the total loss write-offs for February–June 2006.  This omission is surprising, considering that this litigation concerns the delivery of goods from January–June 2006 that Defendants allege were nonconforming, and because Dr. Luna's Report appears to contain Defendants' detailed records regarding the *exact* losses from all deliveries from March 2001 through January 2006.  (*Id.* sched. 7.2.)  The Court specifically inquired about these missing records during oral argument, and defense counsel did not have an explanation for why Defendants relied on loss estimates for February–June 2006.  (Oral Argument Tr. at 41–42.) It would not be appropriate to permit Dr. Luna to *estimate* the losses for February–June 2006 to fill in these gaps, because Defendants concede that Dr. Luna, as a damages expert, has no first-hand knowledge of the amount of nonconforming goods, and that she would not have been qualified to make such a determination.  (Defs.' Cross-Motion Br. at 114 (arguing that Dr. Luna "base[s] her conclusions as to the amount of damages on an assumption regarding the product's characteristics supplied by those with first-hand knowledge").)

Rocheux, as the party seeking summary judgment, has met the burden of production by presenting undisputed facts regarding its shipment of the 2006 deliveries, the balance owed for these goods, and Defendants' failure to pay for or retain these goods.  The burden therefore shifts

28

to Defendants to present more than a "mere scintilla" of evidence to establish a genuine issue of fact.  *See, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (explaining that the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard'") (citing *Anderson*, 477 U.S. at 252).  Defendants appear to have presented evidence indicating that they did not use a small portion of the 2006 deliveries (i.e., the business records Dr. Luna relied upon in schedule 7.2), but as presently constituted, the Court cannot discern what portion Defendants accepted and what portion Defendants rejected or revoked. Defendants have presented evidence that they notified Rocheux that they were rejecting and/or revoking acceptance of a portion of the 2006 deliveries (*see* Margaros Decl. ¶ 11,[13] Luna Report sched. 7.2), and Defendants concede that they used and accepted the remainder of the 2006 deliveries.  Thus, the portion Defendants claim they rejected or revoked may present a question of fact for the jury, and the remainder may be resolved with summary judgment.

Given the voluminous nature of the records that Dr. Luna relied upon to calculate Defendants asserted loss offsets, the Court will not undertake to calculate the exact loss offsets claimed by Defendants for 2006.  Rather, the Court will grant Rocheux's motion for summary judgment without prejudice and give Defendants 15 days from the receipt of the accompanying

---

[13]Although Mr. Margaros's statements regarding rejection and or revocation of the nonconforming goods are only slightly more specific than his statements regarding promises of credits (*compare* Margaros Decl. ¶ 11 *with id.* ¶ 12), which the Court found insufficient to present a question of fact regarding estoppel, *see supra* Part III.A.1, the Court finds that the detailed records of loss, when combined with Mr. Margaros's statements regarding notifying Rocheux that Defendants were rejecting and/or revoking the goods "on each such occasion" (Margaros Decl. ¶ 11), satisfies the "mere scintilla" standard, such that a reasonable jury could conclude that Defendants rejected or revoked a portion of the 2006 deliveries.

Order to submit supplemental documentation and revised calculations of their loss offsets setting forth their exact losses, by value and pound, for 2006.  Defendants shall not base these losses upon an estimate determined from prior deliveries' loss percentages.  The Court will give Rocheux 10 days to respond to any supplemental materials submitted by Defendants on this issue.  Upon review of the parties' submissions, the Court may deny summary judgment in part for the portion (in commercial units) of the 2006 deliveries Defendants contend they rejected and/or revoked, but the Court will award summary judgment in favor of Rocheux for the commercial units that Defendants accepted.[14]

In anticipation that Defendants will submit supplemental documentation and/or revised calculations of loss due to unusable materials so as to substantiate their defenses of rejection and/or revocation of a portion of the 2006 deliveries, the Court notes that this dispute extends no further than (1) *whether Defendants owe the contract price for these goods*, if the factfinder were to find that Defendants did not reject or revoke acceptance of these goods, or (2) *whether Defendants owe a lesser amount reflecting the difference between the value of the scrap material and the costs they incurred by storing and reselling the scrap*, if the factfinder were to resolve that Defendants rejected or revoked acceptance of a portion of the 2006 deliveries.  Defendants appear to argue that they have no liability for worthless rejected goods.  (*See* Defs.' Cross-Motion Br. at 71 (citing *Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1176 (7th Cir. 1994).)

---

[14]The Court notes that Rocheux's secondary arguments, based on its claim for an account stated and UCC §§ 2-515 and 2-603, do not completely resolve the dispute such that the Court may grant final summary judgment in Plaintiff's favor for all the 2006 deliveries.  Defendants have presented evidence creating issues of fact regarding whether they agreed to a specific amount owed for the 2006 deliveries (Green Decl. ¶¶ 24–26), or whether they received instructions from Rocheux within a reasonable time from notification of the defects (Margaros ¶ 11).

But the record indicates that Defendants did not merely discard the defective plastic; they sold it for considerable value.  (Luna Report at 8 (indicating that Rocheux resold the lost material as scrap for $293,330).)  For the 2006 deliveries alone, it appears Defendants resold the lost material at a price of 0.267 per unit, for approximately $50,000.  (*See* Luna Report sched. 2.5.) While Defendants may have had a right to discard the lost material if their storage costs exceeded their value, *see Northrop*, 29 F.3d at 1176, they did not have a right to resell the lost material and keep the resale price.  *See* N.J. Stat. Ann. §§ 12A:2-603 (explaining that, under certain circumstances, the buyer may sell nonconforming goods "for the seller's account," deducting "reasonable expenses of caring for and selling them" and a commercially reasonable commission), 2-604 ("[I]f the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the *seller's account* or reship them to him or resell them for the *seller's account* with reimbursement as provided in the preceding section) (emphasis added).

### B.  Warehouse Goods Cross-Motions

Rocheux next argues that Defendants are liable for the deficiency between the original purchase price and the subsequent resale value of the warehouse goods, as well as the costs Rocheux incurred by storing and reselling the same.  Defendants respond that Rocheux cannot recover these sums as a matter of law because Rocheux improperly repudiated its contracts with Defendants under N.J. Stat. Ann. § 12A:2-609 without demanding adequate assurance and despite receiving such assurance from Defendants.  Defendants do not seek any offset or damages related to the warehouse goods; accordingly, the Court considers whether Rocheux demanded adequate assurance and whether Defendants provided such assurance.

31

Section 12A:2-609 provides in pertinent part:

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

N.J. Stat. Ann. § 12A:2-609(1). The "failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." *Id.* § 12A:2-609(4). Subsection 2 of this provision further provides that "[b]etween merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." *Id.* § 12A:2-609(2).[15]  Accordingly, a number of courts have recognized that the reasonableness of a party's insecurity, the propriety of a demand of assurances, and the adequacy of assurance tendered present questions of fact to be resolved by the jury. *See, e.g.*, *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 285 (3d Cir. 2005) (applying Pennsylvania's UCC provisions and noting that courts generally treat the reasonableness of a party's insecurity as an issue of fact); *Alaska Pacific Trading Co. v. Eagon Forest Prods., Inc.*, 933 P.2d 417, 422 (Wash. Ct. App. 1997) ("The adequacy of a written demand for assurances is a question of fact."); *S & S, Inc. v. Meyer*, 478 N.W.2d 857, 863 (Iowa Ct. App. 1991) (explaining that the reasonableness of a party's insecurity, the adequacy of the demand for assurances, and the adequacy of the assurances received all presented questions of fact). However, in certain circumstances where "reasonable persons could reach only one conclusion, taking all inferences

----

[15]The parties do not dispute that they qualify as merchants under the UCC.

32

in favor of the non-moving party," courts have determined that these issues may be resolved at the summary judgment stage.  *E.g.*, *Alaska Pacific Trading Co.*, 933 P.2d at 422.  With these principles in mind, the Court turns to the parties' cross-motion arguments.

With regard to Defendants' first contention that Rocheux did not demand adequate assurances, Defendants appear to challenge not only the language used by Rocheux in its correspondence, but also Rocheux's grounds for insecurity.  Defendants argue that Rocheux did not demand adequate assurance, as was required by § 12A:2-609 prior to repudiating the parties' contracts, because Rocheux "conditioned its own future performance on Defendants' payment of prior contracts."  (Defs.' Cross-Motion Br. at 20.)  Specifically, Defendants point to the September 21, 2006 letter sent by Rocheux's President Wendy Steed to Defendants' President Jeffrie Green, which states in pertinent part:

> Unless payment of [past-due invoices] is received by September 29th, 2006, Rocheux will have no alternative but to commence an action and seek all appropriate remedies to recover said amount together with all applicable 1.5% interest per month late fees, attorney's fees and other damages available to Rocheux under its terms of sale.  This letter shall also constitute notice of Rocheux's intent, in the event payment is not forthcoming, to sell or otherwise dispose of the material remaining in our warehouse pursuant to UCC § 2-706 and recover any deficiency from you.

(Steed Decl. Ex. F.)  Defendants cite a number of cases for the proposition that a party's breach of a collateral contract does not authorize the aggrieved party to refuse performance under a separate and distinct contract.  However, comment 3 to § 12A:2-609 provides that, "[u]nder commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. . . . Thus a buyer who falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally

33

distinct contracts, impairs the seller's expectation of due performance."  N.J.  Stat. Ann. § 12A:2-609 cmt. 3; *see also Brisbin*, 398 F.3d at 286.  Furthermore, the correspondence relied upon by Defendants indicates that Rocheux's insecurity arose from Defendants' failure to pay for both the 2006 deliveries and the warehouse goods.  Defendants overlook the fact that Rocheux's September 21 letter, as well as Ms. Steed's prior email of August 2, 2006, sought to remedy Defendants' non-payment on the purchase orders that comprised *both* the 2006 deliveries and the warehouse goods.  (Steed Decl. Ex. F (noting that Defendants were past-due on invoices for materials kept in the warehouse); Steed Decl. Ex. A (Aug. 2, 2006 email from Wendy Steed to Jeffrie Green) (noting that she was including "all open invoices" for "the warehouse shipments").)  Rocheux's correspondence indicates that it sought nothing more than the *performance due* under the parties' contracts, which was Defendants' payment for and receipt of the warehouse goods, in addition to Defendants' payment for the 2006 deliveries.  Considering the parties' course of dealings, which included Defendants' undisputed failure to pay more than $2 million of the purchase price for the 2006 deliveries and the warehouse goods, this Court cannot say that Rocheux's insecurity was unreasonable as a matter of law.

Turning to the actual language of Rocheux's correspondence of August 2 and September 21, 2006, which must be read in the context of the parties' prior dealings, the Court notes that Rocheux both (1) clearly conveyed its reasons for insecurity—Defendants' failure to pay substantial sums related to invoices for the 2006 deliveries and the warehouse goods, and (2) clearly indicated that it intended to suspend its own performance.  Specifically, the August 2 email recognized that Defendants had recently sent a check on an invoice, and presented the following proposal to resolve Defendants' problem with past-due invoices:

> Based on your consistent weekly payments and with a full understanding of your short term computer problems I will throw out a proposal for your consideration.
>
> We will ship you on a two to one payment ration; i.e. for every two truckload invoices you pay we will release one truckload. In other words if you pay past due invoices of $100,000 we will release $50,000. This will move us in the right direction so we can be on track when your computer problems are finally resolved.
>
> Please let me know if you have any interest in this option.

(Steed Decl. Ex. A.)  As noted above, the September 21 letter indicated that Rocheux would dispose of the warehouse goods if Defendants did not pay on their past-due invoices.  (Steed Decl. Ex. F.)  Although neither message included the exact term "adequate assurance," courts have generally eschewed applying formalistic requirements for the demand of adequate assurances, instead opting for a case-specific approach that considers a party's demands in the context of its course of dealings with the adverse party.  *See, e.g.*, *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170–71 (7th Cir. 1976) (rejecting a "formalistic" approach to § 2-609, and looking instead to the parties' "clear understanding that [one party] had suspended performance until it should receive adequate assurance of due performance from [the other party]"); *Atwood-Kellogg, Inc. v. Nickeson Farms*, 602 N.W.2d 749, 753 (S.D. 1999) (agreeing with the *AMF* court that "a demand for adequate assurances may be either written or oral, as long as the demand provides a 'clear understanding' of the insecure party's intent to suspend performance until receipt of adequate assurances from the other party"); *see also Cumberland County Improvement Auth. v. GSP Recycling Co.*, 358 N.J. Super. 484, 499 (App. Div. 2003) (finding that plaintiff failed to demand adequate assurance because "plaintiff is unable to point to any written or verbal demand that conveyed plaintiff's intent to terminate deliveries if defendant

either refused to pay the past-due invoices, or refused to pay for future deliveries"); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 332 (D.N.J. 2002) (noting that "courts have routinely accepted as sufficient under § 609 requests for assurances of a far less formal nature" than statements specifically citing § 609); *but see Scotts Co. v. Central Garden & Pet Co.*, No. 2:00-CV-755, 2002 WL 1578781, at *4 (S.D. Ohio Apr. 22, 2004) (applying UCC's requirement that a demand for adequate assurance be made in writing in accordance with the decisions of Ohio courts). Considering the parties' course of dealings, which included multiple in-person meetings between Rocheux and Defendants concerning Defendants' failure to pay accounts on time, the Court cannot say as a matter of law that Rocheux's correspondence of August 2 and September 21, 2006 did not constitute a demand for adequate assurance.

Finally, with regard to assurances provided, Defendants argue that Mr. Green's October 4 letter provided adequate assurance that Defendants would continue to perform under the contract. (*See* Steed Decl. Ex. G (Oct. 4, 2006 letter from Jeffrie Green to Wendy Steed).) This letter generally disputed Defendants' liability for Rocheux's invoices, asserting that "Rocheux alone is responsible for its failure to ship and bill product which we ordered," but nevertheless indicated that Defendants "[we]re willing to purchase the undelivered PVC . . . ordered under [purchase orders] 20491 and 21920." (*Id.* at 1.) The letter also indicated a willingness to purchase "APET which Rocheux did not deliver . . . at the price and terms set forth on our orders . . . ." (*Id.* at 3.) Both of these proposals were conditioned on the assumption that Rocheux would provide "first quality virgin" and "RF sealable" material. (*Id.* at 2–3.) The letter appears to adopt quantities and prices from the parties' 2005–2006 purchase orders. (*See id.* at 3–4.) Defendants further proposed in the letter that:

> [t]he additional PVC and APET may be delivered to us FOB our Ontario facility as we request it.  We hereby advise you that the first delivery may be made the week of October 23, 2006.  We anticipate that the balance of the additional PVC and APET will be requested for delivery prior to April 30, 2007.  Please confirm in writing by no later than Friday, October 5, 2006, that Rocheux will make these deliveries when and as requested.  Upon receipt of your written confirmation, we will advise you in writing of each delivery which we request.  We will also advise you whether the payment will be made on a C.O.D. basis by Company check or whether we will arrange for a letter of credit payable Net 120 days from our receipt of each delivery . . . .

(*Id.* at 4.)  Rocheux's president responded by letter of October 6, 2006, which stated that Defendants' "continuing failure to pay Rocheux's outstanding invoices . . . relieved [Rocheux] of any obligation to ship any material to [Defendants]," but proposed that withheld materials would be released to Defendants "only on the condition that, prior to shipment, [Defendants] open[] an irrevocable letter of credit in favor of Rocheux . . . for an amount not less than the total amount of the open invoices . . . ."  (Steed Decl. Ex. H (Oct. 6, 2006 letter from Wendy Steed to Jeffrie Green).)  The letter concluded "[t]he aforesaid letter of credit need be your only reply."  (*Id.*)  The October 6, 2006 letter appears to have been the last correspondence between the parties on this matter.

Defendants argue that, by offering to pay on a C.O.D. basis or extend a letter of credit in the October 4 letter, they provided adequate assurance as a matter of law.  While Defendants correctly note that courts have generally recognized that letters of credit provide adequate assurance of performance due, *see, e.g.*, *Lustrelon, Inc. v. Prutscher*, 178 N.J. Super. 128, 139 (App. Div. 1981), it is undisputed that Defendants did not provide a letter of credit for the warehouse goods, even after Rocheux's October 6 response indicated that the "letter of credit need be [Defendants'] only reply."  (Steed Decl. Ex. H.)   Furthermore, while some courts have

37

recognized that an insecure party may request C.O.D. payments, *see, e.g.*, *Coke Lumber & Mfg. Co. v. First Nat'l Bank in Dallas*, 529 S.W.2d 612, (Tex. Civ. App. 1975), the Court is aware of no authority for the proposition that an insecure party must accept an assurance of C.O.D. where the delinquent party had fallen in arrears more than $2 million on goods delivered at the time that the insecure party sought assurances of performance.  "Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards," N.J. Stat. Ann. § 12A:2-609(2), and comment 4 to this section notes that "repeated delinquencies must be viewed as cumulative."  Comment 4 further provides:

> What constitutes "adequate" assurance of due performance is subject to the same test of factual conditions.  For example, where the buyer can make use of a defective delivery, a mere promise by a seller of good repute that he is giving the matter his attention and that the defect will not be repeated, is normally sufficient.  Under the same circumstances, however, a similar statement by a known corner-cutter might well be considered insufficient without the posting of a guaranty or, if so demanded by the buyer, a speedy replacement of the delivery involved.

N.J. Stat. Ann. § 12A:2-609 cmt. 4.  Given Defendants' continued failure to pay outstanding invoices regarding the 2006 deliveries and warehouse goods, this Court cannot say as a matter of law that Rocheux's demand for a letter of credit covering these goods was unreasonable.  *Cf. Creusot-Loire Int'l, Inc. v. Coppus Eng'g Corp.*, 585 F.Supp. 45, 50 (S.D.N.Y. 1983) (finding that an insecure party's requests for "an extension of contractual guarantee and the posting of a letter of credit . . . were not unreasonable").

Furthermore, it appears Defendants' October 4 letter sought to change the terms of delivery of the warehouse goods.[16]  The October 4 letter expressly contemplates extending the

---

[16]The Court notes that Rocheux also contends that Defendants sought to buy the warehouse goods for less than the original contract price.  (Steed Decl. ¶ 15.)  However, based on

38

delivery period for the retained goods through April 2007, and that Defendants would reserve 60–120 days to pay upon the deliveries if it provided a letter of credit. Alternatively, it requested that Rocheux propose a "discount for immediate C.O.D. payment rather than payment on extended terms." (Steed Decl. Ex. G at 4.) Generally speaking, a buyer's refusal to perform except upon conditions not required by the contract constitutes repudiation. *E.g.*, *Aero Consulting Corp. v. Cessna Aircraft Co.*, 867 F. Supp. 1480, 1491 (D. Kan. 1994) (finding that a buyer's refusal to pay except upon conditions not required by the contract constituted a repudiation); *see also Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 569 (10th Cir. 1989) (finding assurance inadequate where the party "indicated it would perform only if the contract was amended"). Considering Defendants' history of late payments, this Court cannot say as a matter of law that Rocheux's decision to respond to the October 4 letter by requesting a letter of credit in the October 6 letter was unreasonable as a matter of law.

However, nor can this Court determine as a matter of law that Defendants' letter of October 4 constituted repudiation or provided inadequate assurance. These issues usually present questions of fact to be determined according to commercial standards. *See, e.g.*, *Timmerman v. Grain Exchange, LLC*, 915 N.E.2d 113, 124 (Ill. App. Ct. 2009) ("Whether an anticipatory repudiation has occurred is a question of fact . . . ."); *Upton v. Ginn*, 231 S.W.3d 788, 791 (Ky. Ct. App. 2007) (same); *S & S, Inc.*, 478 N.W.2d at 863 (noting that adequacy of assurance presents a question of fact). This Court finds that a reasonable jury could conclude that Defendants' October 4 letter provided adequate assurance and did not repudiate the parties'

---

this Court's review of the original purchase orders and the October 4 letter, the Court has not been able to discern the price disparity claimed by Rocheux.

contracts.  Accordingly, the Court will deny both parties' cross-motions for summary judgment with regard to the warehouse goods.

### C.  Interest and Attorneys' Fees

Finally, with regard to interest and attorneys' fees, Rocheux argues that it sent two written confirmations in response to each of Defendants' purchase orders—the Terms and Conditions page and a subsequent invoice—both of which included terms for interest on overdue invoices at 1.5% per month and attorneys' fees.  Because the parties are merchants, Rocheux contends that these terms became part of the parties' contract pursuant to N.J. Stat. Ann. § 12A:2-207.

UCC § 2-207 states:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2) The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:

>> (a) the offer expressly limits acceptance to the terms of the offer;

>> (b) they materially alter it; or

>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

N.J. Stat. Ann. § 12A:2-207.  Defendants respond that they never received the Terms and Conditions pages with Rocheux's Order Acknowledgments, that they expressed objection to additional terms in advance of the purchase orders, that the subsequent invoices do not qualify as a "written confirmation" under UCC § 2-207, that the interest and attorneys' fees terms sought by

40

Rocheux materially altered the parties' agreement, and that Rocheux waived these terms by

failing to enforce them.  Of these responses, Defendants only cross-move for summary judgment

on the ground that the additional terms materially altered the parties' agreement.

Defendants have presented evidence that they never received Terms and Conditions pages

Rocheux claims it sent with the Order Acknowledgments.  (*See* Green Decl. ¶ 14; Oprisan Decl.

¶¶ 6–7.)  This evidence presents a genuine issue of material fact regarding whether the Order

Acknowledgments contained the additional terms provided in the Terms and Conditions pages.

Because Rocheux claims that the subsequent invoices also incorporated these terms, the Court

begins with Defendants' argument, raised in opposition to Rocheux's motion for summary

judgment, that § 2-207 does not apply to Rocheux's subsequently sent invoices.  For purposes of

this issue, the Court draws all inferences in the light most favorable to Defendants as the non-

moving party, and presumes that Defendants did not receive the Terms and Conditions pages.

### 1.  *Invoices as Written Confirmations Under UCC § 2-207*

Defendants argue that Rocheux's invoices are not "written confirmations" under the

statute because Rocheux sent them after it accepted the Defendants' purchase orders.  Although

Defendants contest that they received the Terms and Conditions page (page 2) of Rocheux's

Order Acknowledgments, they do not dispute that they received the first page of the Order

Acknowledgments.  The Order Acknowledgments specify the customer purchase orders,

expressly state "Rocheux Int'l acknowledges your order and here by [sic] confirms our

acceptance as follows," and identify the goods, quantities, and prices proposed in the purchase

order.  (*See, e.g.*, McRavin Decl. Ex. F.)  It is undisputed that Rocheux subsequently shipped

goods related to the purchase orders to Defendants.  Considering the express terms of the Order

41

Acknowledgments and the parties' course of dealing, this Court may conclude that the Order Acknowledgments constituted Rocheux's acceptance of Defendants' offers to purchase goods. *See* N.J. Stat. Ann. § 12A:2-206(2) ("Unless otherwise unambiguously indicated by the language or circumstances . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods . . . ."). Yet, Rocheux did not send the respective invoices for the purchase orders until after it sent the Order Acknowledgments. Although the invoices were typically sent within a day of the shipment, they sometimes came a matter of months after the Order Acknowledgments. (*See, e.g.*, Pl.'s 56.1 Statement ¶¶ 29–31 (January 19, 2006 Order Acknowledgment, March 22, 2006 Bill of Lading, March 22, 2006 invoice),116–18 (November 17, 2005 Order Acknowledgment, January 23, 2006 Bill of Lading, January 24, 2006 invoice).) Thus, Defendants correctly conclude that Rocheux's invoices came after it accepted Defendants' offers to purchase goods.

It does not appear that New Jersey's courts have considered whether a writing sent after the acceptance of goods can modify the parties' agreement pursuant to N.J. Stat. Ann. § 12A:2-207. Accordingly, this Court must predict how the New Jersey Supreme Court would interpret this statutory provision. *Zamboni v. Stamler*, 847 F.2d 73, 81 (3d Cir. 1988). Because this issue requires the interpretation of a provision of the UCC, this Court looks to decisions of courts in other jurisdictions for guidance. *See, e.g.*, *Green Constr. Co.*, 735 F. Supp. at 1260 & n.2.

There is a considerable split of authority regarding whether a document sent after the delivery of goods qualifies as a "written confirmation" capable of modifying the parties' agreement under UCC § 2-207. *Compare Cosden Oil & Chem. Co. v. Karl O. Helm*

*Aktiengesellschaft*, 736 F.2d 1064, 1075–76 (5th Cir. 1984) (applying Texas's UCC provisions and finding that an invoice sent after the shipment of goods did not modify the contract pursuant to § 2-207), *and Wheaton Glass Co. v. Pharmex, Inc.*, 548 F. Supp. 1242, 1244 (D.N.J. 1982) (same, applying New Jersey's UCC provisions), *and* 1 White & Summers, Uniform Commercial Code § 1-6 (5th ed. West 2010) ("[W]here the buyer sends a purchase order, the seller then ships the goods, and thereafter sends a form that arrives after the goods arrive, 2-207 does not control.") *with Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 654 (5th Cir. 1991) (applying Texas's UCC provisions to suggest that invoices included with shipments constituted a proposal capable of modifying the agreement under § 2-207), *and Advance Concrete Forms, Inc. v. McCann Const. Specialties Co.*, 916 F.2d 412, 415 (7th Cir. 1990) (applying Wisconsin's UCC provisions and determining that a seller's invoice sent after shipment of goods constituted a confirmation capable of modifying the parties' agreement under § 2-207), *and McJunkin Corp. v. Mech., Inc.*, 888 F.2d 481, 487 (6th Cir. 1989) (same, applying Ohio's UCC provisions to a seller's order acknowledgment sent after delivery of the goods), *and Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1122–24 (5th Cir. 1985) (per curiam) (same, applying Mississippi's UCC provisions to seller's invoice sent after shipment of goods), *and Sudenga Indus. v. Fulton Performance Prods., Inc.*, 894 F. Supp. 1235, 1237–38 (N.D. Iowa 1995) (same, applying Iowa's UCC provisions to seller's invoices sent after shipment of goods, but "done relatively contemporaneously" with the shipment), *and Herzog Oil Field Service v. Otto Torpedo Co.*, 570 A.2d 549, 550–51 (Pa. Super. Ct. 1990) (same, applying Pennsylvania's UCC provisions to seller's invoices sent after shipment of goods); *see also Step-Saver*, 939 F.2d at 101 n.29 (citing *Herzog* and *McJunkin* and suggesting that § 2-207 applies to writings sent

43

after performance).  Although the above cases suggest that a majority of jurisdictions are willing

to apply § 2-207 to invoices submitted after the delivery of goods, these decisions do not speak to

the exact issue before this Court: whether § 2-207 applies to a subsequent written confirmation

proposing additional terms, made after a prior written confirmation proposing different additional

terms.  Indeed, in each of the above cases finding that § 2-207 applied to the seller's invoices, it

appears as though the invoice was the first writing formalizing the seller's acceptance.  As such,

the invoice had the added legal significance of making the parties' contracts enforceable in the

face of the statute of frauds.  *See, e.g.*, *Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d at

1123; *Sudenga Indus.*, 894 F. Supp. at 1238.

Here, there is no dispute that the Order Acknowledgments constituted written

confirmations under § 2-207.  Pursuant to the statute, each Order Acknowledgment thus

"operate[d] as an acceptance."  N.J. Stat. Ann. § 12A:2-207.  Generally speaking, "[o]nce a

contract is formed, the parties may of course change their agreement by another agreement, by

course of performance, or by conduct amounting to a waiver or estoppel.  In order to determine

the terms of such change, we look to UCC 2-208 and 2-209, not 2-207."  *CT Chems. (U.S.A.),*

*Inc. v. Vinmar Impex, Inc.*, 613 N.E.2d 159, 162 (N.Y. 1993) (citing 1 White and Summers,

Uniform Commercial Code § 1-3, at 36-37, n. 22, § 1-6, at 57 (3d ed.)).  Section 2-207 does not

contemplate multiple written confirmations operating as acceptance, with each confirmation

having the capability of adding new and/or different terms.[17]  If it did, the present case would

---

[17]The present situation differs from the "battle of the forms" that occurs when the buyer and seller exchange forms presenting different terms.  *See Northrop Corp.*, 29 F.3d at 1174–75 (discussing different approaches to the "battle of the forms" problem).  Here, the seller sent both forms, and, according to Rocheux, the forms included different additional terms.

44

present a unique dilemma of which additional term regarding attorneys' fees governs: the flat

25% rate purportedly included with the Order Acknowledgment, or the "reasonable attorney's

fees" term appearing on the subsequent invoice.  Rather, according to the comment, the statute

> is intended to deal with two typical situations. The one is the written
> confirmation, where an agreement has been reached either orally or by
> informal correspondence between the parties and is followed by one or
> both of the parties sending formal memoranda embodying the terms so far
> as agreed upon and adding terms not discussed. The other situation is
> offer and acceptance, in which a wire or letter expressed and intended as
> an acceptance or the closing of an agreement adds further minor
> suggestions or proposals such as "ship by Tuesday," "rush," "ship draft
> against bill of lading inspection allowed," or the like.  A frequent
> example of the second situation is the exchange of printed purchase order
> and acceptance (sometimes called "acknowledgment") forms.

N.J. Stat. Ann. § 12A:2-207 cmt. 1.  Had Rocheux simply sent the ordered goods

contemporaneously with the invoices without previously sending the Order Acknowledgment,

this matter would appear to fall under the first scenario presented by the comment.  Rocheux

relies heavily upon this Court's prior decision in *Phibro Animal Health U.S., Inc. v. Cornerstone

AG Products*, Civ. No. 03-2664, 2006 WL 2570839, at *4 (D.N.J. Sept. 5, 2006), wherein the

Court allowed invoice interest terms to become part of the contract.  However, the parties in

*Phibro* did not dispute the applicability of the interest terms, and it appears that the parties in that

case did not exchange any other confirmatory memoranda prior to the invoices.  Thus, the

circumstances in *Phibro* differ from the circumstances in this case.  Accepting Rocheux's

representations about the Order Acknowledgment for purposes of argument, the present case

appears to fall into the second scenario suggested by the comment: the Order Acknowledgment

was intended to act as acceptance, and it included additional terms.  Rocheux's subsequently-sent

invoices that included different additional terms are of no moment under § 2-207.

Rocheux also argues that the parties' course of dealing, which spanned more than five years and always involved Order Acknowledgments and invoices bearing these additional terms, enables the invoice terms to become part of the parties' bargain regardless of § 2-207.  However, the Third Circuit rejected this contention in *Step-Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91, 104 (3d Cir. 1991) ("[W]e hold that the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2-207.").  Although *Step-Saver* applied Pennsylvania's UCC provisions, this Court has found no authority from New Jersey courts suggesting that they would adopt a contrary position.

Because the invoices cannot supply the additional terms sought by Rocheux, the additional terms must derive from the Order Acknowledgment.  As the Court noted above, there remains a genuine dispute of fact regarding whether or not Defendants received the Terms and Conditions pages containing the additional arguments.  For this reason, the Court must deny Rocheux's motion for summary judgment with regard to interest and attorneys' fees.[18]

### 2. Defendants' Cross-Motion: Material Alteration

Having denied Rocheux's motion, the Court considers Defendants' cross-motion for summary judgment on the ground that the additional terms would materially alter the parties' agreement.  For purposes of adjudicating this issue, the Court must draw all inferences in the light most favorable to Rocheux as the non-moving party.  The Court will therefore presume that

---

[18]Because the Court denies Rocheux's motion on the basis of Defendants' argument that § 2-207 does not apply to the subsequent invoices, the Court need not consider Defendants' other responsive arguments sounding in prior objection to the terms and waiver.

Defendants did receive the Terms and Conditions pages with the Order Acknowledgments for purposes of this cross-motion.

Rocheux presently seeks to apply an 18% annual service charge and a flat attorneys' fees rate calculated as 25% of Defendants' outstanding balance, in accordance with the interest and attorneys' fees terms stated on the Terms and Conditions pages of the Order Acknowledgments. Defendants argue that the interest and attorneys' fees rates should not become a part of the contracts under N.J. Stat. Ann. § 12A:2-207, because they would materially alter the parties' agreements and unduly burden Defendants.  Based on Rocheux's calculation of interest and the flat rate for attorneys' fees, it appears that these terms would add approximately $2 million in interest and approximately $1 million in attorneys' fees to Defendants' liability if they apply to the parties' agreements.  (*See* Defs.' Cross-Motion Br. at 28, 30.)[19]  Defendants rely on New Jersey's usury statute, N.J. Stat. Ann. § 31:1-1 (proscribing certain interest rates exceeding 6% and 16%) and case law to argue that these rates would materially alter the parties' agreement and substantially burden Defendants under the circumstances in this case.

The Court notes that there is a considerable split of authority among jurisdictions regarding whether the material alteration determination presents a question of law or fact.  In New Jersey, two federal district court decisions resolved the matter as presenting a question of fact for the jury, *ICI Australia Ltd. v. Elliott Overseas Co.*, 551 F. Supp. 265, 269 (D.N.J. 1982), *Wheaton Glass Co.*, 548 F. Supp. at 1245, but it appears that the Third Circuit has taken a

---

[19]The parties do not consider how the interest and attorneys' fees would be affected by a finding that Defendants rejected and/or revoked a portion of the 2006 deliveries.  However, because the Court is denying Rocheux's motion for summary judgment as it regards interest and attorneys' fees, the Court need not resolve the exact interest and attorneys' fees calculations at this time.

different approach in cases applying New Jersey law, *see CECG, Inc. v. Magic Software Enters., Inc.*, 51 F. App'x 359, 364 (3d Cir. 2002) (affirming district court's finding that an additional term providing an "unlimited runtime license . . . constituted a material alteration of the contract and therefore did not become part of the contract"), *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 287–88 (3d Cir. 1993) (noting that "[s]ection 2-207 of the UCC is designed to prescribe, by law, what non-negotiated terms are to be considered a part of a contract" in response to an argument that an additional term materially altered the parties' agreement as a matter of law), *cf. Step-Saver*, 939 F.3d at 105 (applying Pennsylvania's UCC provisions and concluding "as a matter of law" that the additional terms appearing on the software box-top license "substantially alter the distribution of risk between [the parties]" and, therefore, did not become a part of the contract under § 2-207).  It further appears that the prevailing authority is for the court to decide the matter as either a question of fact or law.  *See, e.g.*, *American Ins. Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1190 (10th Cir. 1992) (applying New Mexico's UCC provisions, and determining that the trial court must make findings of fact regarding whether the additional term constituted a material alteration); *Luedtke Eng'g Co. v. Ind. Limestone Co.*, 740 F.2d 598, 600 (7th Cir. 1984) (same, applying Indiana's UCC provisions); *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1169 (6th Cir. 1972) (same, ostensibly applying Tennessee law); *Herzog*, 570 A.2d at 551–52 (applying Pennsylvania law and determining material alteration issue as a matter of law); *Extel Corp. v. Cermetek Microelectronics, Inc.*, 539 N.E.2d 320, 323 (Ill. App. Ct. 1989) (same).  This Court finds that the prevailing trend is consistent with the approach applied by the Third Circuit in *CECG*, *Olefins Trading*, and *Step-Saver*, and the Court will determine the issue as a mixed question of

fact and law.

In deciding whether the additional terms materially altered the parties' agreement, this Court begins with the UCC comments on § 2-207.  *See El Paso Pipe & Supply Co.*, 978 F.2d at 1189; *Luedtke Eng'g*, 740 F.2d at 600.  Comment 4 to § 2-207 indicates that an additional term constitutes a material alteration where the term "result[s] in surprise or hardship if incorporated without express awareness by the other party."   Comment 4 further provides the following examples of material alterations:

> a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

Comment 5, meanwhile, provides the following examples of permissible alterations:

> a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2-718 and 2-719).

N.J. Stat. Ann. § 12A:2-207 cmts. 4, 5.  "[W]hether an addition to a contract constitutes a material alteration . . . depends on the unique facts of every case."  *El Paso Pipe & Supply Co.*,

49

978 F.2d at 1190; *accord Comark Merch., Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1203 n.8 (7th Cir. 1991).

In determining whether the additional terms constituted an unreasonable surprise, this Court considers a number of factors, including: (1) the parties' prior course of dealing; (2) industry custom; (3) how clearly the additional terms were marked in the confirmation; and (4) whether the additional terms appeared in the parties' standard forms. *See El Paso Pipe*, 978 F.2d at 1191 (collecting cases). "A profession of surprise and raised eyebrows are not enough . . . . To carry the burden of showing surprise, a party must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term." *Bayway Refining Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 224 (2d Cir. 2000) (citation omitted). In determining whether the additional terms imposed an unreasonable hardship on the non-assenting party, the Court considers "whether the clause at issue would impose substantial economic hardship on the nonassenting party." *Id.* (citations omitted); *see also Trans-Aire Int'l, Inc. v. N. Adhesive Co., Inc.*, 882 F.2d 1254, 1262 (7th Cir.1989). "The nonassenting party has burden of proving surprise or hardship." *El Paso Pipe*, 978 F.2d at 1190 n.9; *Comark Merch.*, 932 F.2d at 1201.

### a. Surprise

In this case, Rocheux has presented evidence that it sent Terms and Conditions pages with each Order Acknowledgment it sent related to the 2006 deliveries. (*E.g.*, McRavin Decl. Ex. F.) Rocheux has also presented evidence that it sent Defendants hundreds of invoices and credit memos bearing the same additional terms for interest and attorneys' fees as the 2006

invoices[20] between 2000 and 2006 with regard to prior purchase orders.  (McAlindin Decl. Ex. E

pts. 1–16.)  These forms bear Defendants' bates stamp, and many of them have been stamped

"Ok to pay."  Each of these forms—both those related to the 2006 deliveries and those related to

prior purchases—appear to be Rocheux's standard printed sales forms.  Furthermore, the terms

for interest and attorneys' fees appear in roughly the same prominence as the other terms on these

documents.  On each of the credit memos and invoices, the additional terms for interest and

attorneys' fees clearly appear as the final line entry on the form.  (*E.g.*, McRavin Decl. Ex. K.)

On each of the Terms and Conditions pages, the additional terms appear under a prominent

heading labeled "LATE CHARGES AND DEFAULT."  (*E.g.*, McRavin Decl. Ex. F.)

Collectively, these forms demonstrate a course of dealing between the parties where Rocheux's

standard sales forms repeatedly notified Defendants of these additional terms every time

Defendants made a purchase or received a credit or delivery between 2000 and 2006.  In such

circumstances, courts have found that additional terms for attorneys' fees and interest became

part of the parties' agreements pursuant to UCC § 2-207.  *E.g.*, *Mid-South Packers*, 761 F.2d at

1123 (concluding that the interest and attorneys' fees terms could not come as a surprise, because

the buyer had received numerous invoices bearing those terms during the parties' course of

dealing); *Boyd v. Oscar Fisher Co.*, 258 Cal. Rptr. 473, 479 (Cal. Ct. App. 1989) (same); *Offen,

Inc. v. Rocky Mountain Constructors, Inc.*, 765 P.2d 600, 601 (Colo. Ct. App. 1988) (same).

    Defendants argue that they have presented evidence that they previously objected to

additional terms and that Rocheux waived these terms by not charging interest or attorneys' fees

---

[20]As noted above, the invoices refer to "reasonable attorneys' fees," while the Terms and
Conditions pages have a term for attorneys' fees in the amount of 25% of the outstanding
balance.

51

prior to the 2006 deliveries.  Neither argument has evidentiary support.  Mr. Green's Declaration, which Defendants rely upon to demonstrate previous objection to additional terms, states that he met with Rocheux salesman Michael Flood at the beginning of the parties' relationship, ostensibly in or about 2000.  The Declaration further states that Mr. Green advised Mr. Flood that "[Defendants] do not accept additional terms and conditions from our vendors. . . . [Mr. Flood] agreed that if we did business, it would be on the terms I outlined and he agreed to them on behalf of Rocheux."  (Green Decl. ¶ 11.)  However, these statements refer to the parties' negotiation expectations, and do not indicate that the parties formed a contract for the sale of goods that was limited by Mr. Green's terms.  Furthermore, Defendants do not suggest that Rocheux previously proposed terms for interest and attorneys' fees, and that Defendants rejected these terms.  Rather, the undisputed records indicates that Defendants began making orders, and Rocheux began sending confirmations and invoices containing additional terms that Defendants never noticed or rejected.  Under such circumstances where the non-assenting party does not respond to the additional terms, comment 6 to § 2-207 instructs that "it is both fair and commercially sound to assume that [the additional terms'] inclusion has been assented to."  N.J. Stat. Ann. § 12A:2-207 cmt. 6; *see also Vulcan Auto. Equip., Ltd. v. Global Marine Engine & Parts, Inc.*, 240 F. Supp. 2d 156, 162 (D.R.I. 2003).

With regard to Defendants' waiver argument, the Declarations of Mr. Green and Defendants' accounting representative Catalin Oprisan generally aver that Rocheux never charged interest or attorneys' fees for prior past-due invoices.  (Green Decl. ¶ 15; Oprisan Decl. ¶ 7.)  Other than the 2006 deliveries, Defendants do not specify another time when they fell behind on paying their invoices or how those defaults were remedied.  Rocheux disputes that

Defendants ever fell behind on accounts so as to trigger these default terms.  (Rocheux's Reply Br. at 22; Stephanoff Decl. ¶ 19.)  However, even if Rocheux declined to enforce such terms on prior occasions, the Terms and Conditions page contained a savings clause specifying that "Rocheux's failure to insist on performance of any of the terms and conditions . . . shall not thereafter waive any other terms, conditions or privileges, whether of the same or similar type." (*E.g.*, McRavin Decl. Ex. F.)

Having carefully considered the parties' evidence under the factors outlined above, this Court concludes that Defendants should have known of the additional terms appearing on the hundreds of sales forms, and that Defendants have not met the burden of proving unreasonable surprise.

### b.  Hardship

Having determined that the additional terms did not constitute unfair surprise, the Court notes that a number of courts have suggested that hardship does not provide independent grounds for a finding of material alteration.  *See, e.g.*, *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir. 1991) (noting that comment 4 to § 2-207 provides examples of additional terms that would typically materially alter the contract "and *so result in surprise or hardship* if incorporated," and concluding that "[h]ardship is a consequence, not a criterion") (emphasis in original); *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012, 1017–18 (E.D.N.Y. 1996) (citing *Union Carbide* with approval and excluding hardship from the court's consideration of material alteration); *see also Bayway Refining*, 215 F.3d at 226 (noting the persuasive authority of *Union Carbide*).  Although the Court finds the reasoning of these courts to be sound in light of § 2-207's comments, the Court will consider Defendants' evidence

53

regarding hardship in the absence of guidance from the New Jersey courts.

As noted above, Defendants argue that Rocheux's calculations of interest and attorneys' fees (approximately $3 million combined) would cause Defendants significant hardship, considering that Rocheux seeks only $2.5 million in damages.  However, the Court notes that the current interest and attorneys' fees calculations necessarily reflect the protracted nature of the parties' attempts to resolve the instant dispute.  Had the parties resolved the matter within one year as opposed to four, the interest and attorneys' fees would have been roughly 1/3 of the current estimates.[21]  The Court bears these circumstances in mind in assessing Defendants' hardship argument.  *See Bayway Refining*, 215 F.3d at 226 ("You cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you . . . .") (quoting *Union Carbide*, 947 F.2d at 1336).

Defendants cite New Jersey's usury statute and cases to challenge the inclusion of these terms under UCC § 2-207.  *See, e.g.*, *Springfield School Dist. R-12 v. Transamerica Ins. Co.*, 633 S.W.2d 238, 247 (Mo. Ct. App. 1982) (declining to incorporate additional term for 18% annual interest rate under § 2-207); *Herzog*, 570 A.2d at 551–52 (declining to incorporate additional term for attorneys' fees under § 2-207); *Johnson Tire Serv., Inc. v. Thorn, Inc.*, 613 P.2d 521, 523 (Utah 1980) (same).  The Court notes, however, that the *Herzog* decision upon which Defendants heavily rely also found that an 18% annual interest rate on past-due invoices did not constitute a material alteration, noting that such an interest rate "is common in commercial circles, including transactions with non-merchants."  *Herzog*, 507 A.2d at 551 ("We have little

---

[21]Eighteen percent interest on $2.5 million is $450,000, and 25% fees of the combined principle and interest is $737,500.  Under this hypothetical, the combined interest and fees would be $1,187,500.

difficulty in determining that the interest charge term is not one that materially alters the agreement.").  Indeed, it appears as though the majority approach has been to allow additional interest terms to become part of the contract.  *See, e.g.*, *Advance Concrete Forms*, 916 F.2d at 416 (applying Wisconsin's UCC provisions and incorporating 18% interest rate under § 2-207 as a non-material alteration); *Vulcan Auto.*, 240 F. Supp. 2d at 161–62 (same, applying Rhode Island's UCC provisions, and noting "this appears to be the majority rule as a number of circuits have reached the same conclusion"); *Extel Corp.*, 539 N.E.2d at 323 (same, applying Illinois' UCC provisions); *Rangen, Inc. v. Valley Trout Farms, Inc.*, 658 P.2d 955, 963 (Idaho 1983) (same, applying Idaho's UCC provisions to additional term providing for 12%–18% interest on past-due accounts, and finding the interest rates reasonable under UCC's liquidated damages provision in § 2-718); *see also Mid-South Packers*, 761 F.2d at 1123 (applying Mississippi's UCC provisions and incorporating interest term under § 2-207); *Boyd*, 258 Cal. Rptr. at 479 (same, applying California's UCC provisions); *Offen*, 765 P.2d at 601 (same, applying Colorado's UCC provisions).  As noted above, this Court previously permitted a comparable invoice interest term to become part of the parties' contract in *Phibro*, 2006 WL 2570839, at *4 (awarding judgment on 24% annual interest rate provided for in the seller's invoice).  This trend appears consistent with the instructions of comment 5 to § 2-207, which lists interest on past-due invoices as an example of a non-material alteration, so long as it is "within the range of trade practice."  *See* N.J. Stat. Ann. § 12A:2-207 cmt. 5; *see also El Paso Pipe*, 978 F.2d at 1190 ("We can readily understand why . . . [a] provision allowing for interest on overdue invoices became a part of the agreement.  It is precisely one of the examples of clauses that do not constitute material alterations listed in Comment 5.").

55

The Court is not persuaded that New Jersey's usury statute, which Defendants concede does not apply to the instant dispute, *see* N.J. Stat. Ann. § 31:1-6 ("No corporation . . .shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation."), demands a contrary finding.  The 18% rate allegedly proposed by Rocheux does not substantially exceed the 16% rate imposed by the usury statute for written contracts that specify rates of interest.  *See* N.J. Stat. Ann. § 31:1-1. Defendants have not presented evidence that Rocheux's interest rate exceeds the trade practice, and Rocheux's proposed interest rate is within the range permitted by the majority of courts listed above.  The fact that Defendants' delays have led to substantial amounts of accrued interest does not by itself warrant a finding of hardship.  *See Advance Concrete Forms*, 916 F.2d at 414–416 (incorporating interest rate provision under § 2-207 where accrued interest (more than $25,000) was more than half the outstanding balance (approximately $32,000).)   Ultimately, the comments to § 2-207, the above authority, and the evidence in this case all convince this Court that the 18% interest rate allegedly proposed by Rocheux's Order Acknowledgments does not create a substantial hardship.

The attorneys' fees term presents a slightly more difficult issue.  Defendants correctly note that courts in Pennsylvania and Utah have squarely rejected additional terms for attorneys' fees under § 2-207.  *Herzog*, 570 A.2d at 551–52; *Johnson Tire*, 613 P.2d at 523.  However, a number of courts have also allowed the incorporation of attorneys' fees under § 2-207. *Mid-South Packers*, 761 F.2d at 1123 (applying Mississippi's UCC provisions); *Cement Asbestos Prods. Co. v. Hartford Accident & Indem. Co.*, 592 F.2d 1144, 1148 (10th Cir. 1979) (applying Colorado's UCC provisions); *Boyd*, 258 Cal. Rptr. at 479 (applying California's UCC

56

provisions); *Offen*, 765 P.2d at 601 (applying Colorado's UCC provisions); *Rangen*, 658 P.2d at

966 (applying Idaho's UCC provisions).  This split of authority led the Seventh Circuit in

*Comark Merchandising, Inc. v. Highland Group, Inc.* to conclude that "each [case] turns on its

own unique factual scenario."  932 F.2d at 1203 n.8 (concluding, in light of the district court's

factual finding that the attorneys' fees term did not appear in the seller's forms, that attorneys'

fees were properly excluded).

    The Court notes that in many of the cases allowing the incorporation of attorneys' fees

under § 2-207, it appears that the parties did not object to the additional term, and most of the

cases on both sides of the issue contain scant discussion of the material impact of the attorneys'

fees terms.  Based on this Court's review of these decisions, it appears that *Herzog* is the only

one to discuss material alteration at length.  In considering an identical 25% attorneys' fees

provision, the *Herzog* court reasoned:

> in common experience an attorney's fee provision is considerably less
> common than an interest rate provision; thus, it would not be as readily
> expected or anticipated.  Secondly, when found, such clauses are usually
> less than 25% of the balance, often 10 or 15%, thus bringing the
> reasonableness of this particular clause into question. Thirdly, a lump
> sum addition of 25% changes the obligor's financial obligation under the
> contract to, what must be considered, a material degree.  Fourthly, we
> choose to follow the precedent of *Johnson Tire Service, Inc. v. Thorn,
> Inc.*, 613 P.2d 521, 529 (Utah, 1980) . . . .

570 A.2d at 551–52.  The *Herzog* court provided no authority for its observations about the

frequency or usual rate of attorneys' fees provisions, and Defendants have not presented

compelling evidence regarding industry custom for attorneys' fees terms.[22]  Furthermore, the

_____

[22] Defendants' accounting representative Catalin Oprisan states that, to his knowledge,
none of Defendants' other suppliers required interest and attorneys' fees terms, adding that,
based on his experience, "such an agreement would be unusual and not standard in our business."

*Herzog* court's third reason—material change to the buyer's financial obligation—lacks persuasive appeal under the unique facts of this case, where application of the attorneys' fees provision would result in fees (approximately $1 million) that are roughly half the amount of interest charged (more than $2 million).  This Court has already found that the interest provision did not cause undue hardship and, thus, did not materially alter the parties' agreement.  It would defy reason for this Court to conclude that an attorneys' fees provision that is seven percentage points higher on paper, but substantially less in application, does.[23]  Furthermore, unlike the interest rate provision, which applies to all past-due invoices, the attorneys' fees provision ostensibly only applies if Rocheux incurs legal costs to collect past-due sums.  (*See* McRavin Decl. Ex. F.)  Given the protracted nature of this litigation, the Court cannot definitively say that a flat 25% rate for attorneys' fees would be more onerous than a term for "reasonable attorneys' fees."  *Cf. Rangen*, 658 P.2d at 957, 966 (allowing additional term for "reasonable attorney fees" under § 2-207 and indicating that this term included the costs of appeals).

A reasonable term for attorneys' fees, which presumes the need to take legal action to recover sums owed under contract, more closely resembles a term for interest on past-due invoices than any of the examples of material alteration provided by comment 4 to § 2-207.

_____

(Oprisan Decl. ¶ 8.)  However, Defendants also state that they never knew of the interest and attorneys' fees provisions appearing on Rocheux's Order Acknowledgments, invoices, and credit memos from the past six years.  Even construing industry custom in Defendants' favor, the Court cannot say that this factor alone demonstrates unreasonable hardship, for the same reasons that this Court found that the attorneys' fees term did not constitute unreasonable surprise.

[23]Based on Rocheux's proposed terms, the 18% interest rate surpasses the 25% attorneys' fees provision in terms of additional costs to the defaulting party for any dispute that lasts longer than a year and a half.  The longer the dispute goes, the more the charged interest exceeds attorneys' fees.

Under the unique facts of this case, the Court cannot say as a matter of law that the attorneys' fees provision allegedly added by Rocheux's Order Acknowledgments constituted an unreasonable hardship.

Because Defendants have failed to demonstrate unreasonable surprise or hardship, the Court concludes that the interest and attorneys' fees provisions did not materially alter the parties' agreements, and the Court will deny Defendants' cross-motion in this regard.

## IV.   ROCHEUX'S CHALLENGE TO DEFENDANTS' EXPERT WITNESSES

This Court's rulings with respect to Defendants' cross-motion to redesignate and Rocheux's motion for summary judgment on the 2006 deliveries necessarily affect the relevance of the testimony of Defendants' proposed expert witnesses.  An expert witness who did not examine the 2006 deliveries is not qualified to testify as to the factual issue regarding the portion of the 2006 deliveries that were unusable (losses) or otherwise nonconforming.  Because the parties' briefing on the expert witness issue did not anticipate the limitations now imposed by this Court with regard to the scope of the remaining claims, the Court will deny Rocheux's motion *in limine* without prejudice and permit Rocheux to renew their motion in light of this Court's rulings on the cross-motions.

## V.   CONCLUSION

For the aforementioned reasons, the Court will grant Rocheux's motion for summary judgment (Doc. No. 88) in part without prejudice and deny Defendants' cross-motion for summary judgment (Doc. No. 92).  Defendants will have 15 days from receipt of the accompanying Order to submit supplemental documentation and revised calculations of their loss offsets setting forth their exact losses, by value and pound, for 2006.  Rocheux will have 10 days

to respond to Defendants' submissions on this issue.  The Court will allow Defendants to redesignate their affirmative defenses, but the Court will limit these counterclaims to the 2006 deliveries.  The Court will also deny Rocheux's motion *in limine* (Doc. No. 87) without prejudice and permit Rocheux to renew this motion in light of this Court's rulings on the cross-motions. An appropriate form of order accompanies this Memorandum Opinion.


September 29, 2010


_____/s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.


60