Brian J. McMahon, Esq.
Joshua R. Elias, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

Attorneys for Defendants
U.S. Merchants Financial Group, Inc.,
U.S. Merchants, Inc., The Merchant of Tennis, Inc.
and Diversified Repackaging Corporation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROCHEUX INTERNATIONAL OF NEW JERSEY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> U.S. MERCHANTS FINANCIAL GROUP, INC., U.S. MERCHANTS, INC., a division of U.S. MERCHANTS FINANCIAL GROUP, INC. d/b/a U.S. MERCHANTS and/or THE MERCHANT OF TENNIS, INC., and DIVERSIFIED REPACKAGING CORPORATION, <br><br> Defendants. | Civil Action No. 06-6147 (GEB)(ES) <br><br> **DECLARATION OF NICK MARGAROS IN SUPPORT OF DEFENDANTS' SUBMISSION OF SUPPLEMENTAL DOCUMENTATION AND REVISED CALCULATIONS OF LOSS OFFSETS FROM JANUARY 2006 – JUNE 2006** |

## DECLARATION OF NICK MARGAROS

I, Nick Margaros, declare, under penalty of perjury, as follows:

1.      I am the thermoforming manager for Defendants U.S. Merchants Financial Group, Inc., U.S. Merchants, Inc., The Merchant of Tennis, Inc., and Diversified Repackaging Corporation (collectively, "Defendants"). I make this declaration in support of Defendants' submission of supplemental documentation and revised calculations of loss offsets for January 2006 to June 2006. I have personal knowledge of the facts set forth herein.

#1571118 v1
107314-58989

2.      Attached hereto as Exhibit A is a true and correct copy of my April 14, 2010 declaration submitted in support of Defendants' cross motions and in opposition to plaintiff's motions for summary judgment and to bar Defendants' experts, which is herein incorporated by reference.

3.      From January 2006 through June 2006, Plaintiff Rocheux International of New Jersey, Inc. ("Rocheux") was Defendants' principal supplier of rolls of thermoforming plastic film. During this time period, a portion of the plastic provided by Rocheux was not of a quality comparable to that generally acceptable in Defendants' line of trade. The product supplied exhibited defects and nonconformities such as discoloration, flow marks and waviness, pitting, scratches, sealability issues (cracking, inconsistent edges, plastic sticking to the die), split rolls, and varying gauges. I personally viewed and observed these defects and nonconformities in the materials delivered between January 2006 and June 2006.

4.      The aforementioned defects and nonconformities in the goods delivered by Rocheux between January 2006 and June 2006 led to an excessive amount of unusable material that was sent to scrap.

I further declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration is executed at Ontario, California this 13ᵗʰ day of October, 2010.

NICK MARGAROS

#1571118 v1
107314-58989

# EXHIBIT A

Brian J. McMahon, Esq.
Joshua R. Elias, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

Attorneys for Defendants
U.S. Merchants Financial Group, Inc.,
U.S. Merchants, Inc., The Merchant of Tennis, Inc.
and Diversified Repackaging Corporation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROCHEUX INTERNATIONAL OF NEW JERSEY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> U.S. MERCHANTS FINANCIAL GROUP, INC., U.S. MERCHANTS, INC., a division of U.S. MERCHANTS FINANCIAL GROUP, INC. d/b/a U.S. MERCHANTS and/or THE MERCHANT OF TENNIS, INC., and DIVERSIFIED REPACKAGING CORPORATION, <br><br> Defendants. | Civil Action No. 06-6147 (GEB)(ES) <br><br> **DECLARATION OF NICK MARGAROS IN SUPPORT OF DEFENDANTS' CROSS-MOTIONS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO BAR DEFENDANTS' EXPERTS** |

## DECLARATION OF NICK MARGAROS

I, Nick Margaros, declare, under penalty of perjury, as follows:

1.      I am the thermoforming manager for Defendants U.S. Merchants Financial

Group, Inc., U.S. Merchants, Inc., The Merchant of Tennis, Inc., and Diversified Repackaging

Corporation (collectively, "Defendants"). I make this declaration in support of Defendants'

cross motions and in opposition to plaintiff's motions for summary judgment and to bar

Defendants' experts. I have personal knowledge of the facts set forth herein.

2.      I have worked full time in the plastic packaging and thermoforming business for over 18 years. After completing coursework in plastic manufacturing, since approximately 1992, I have worked as a full time employee in the packaging industry dealing with the production of plastic packaging. I began this work at Serv-All where I worked on an assembly line and became the lead person in radio frequency sealing of PVC packaging products. After about six months, I began working in plastic thermoforming as well. I learned to operate a thermoforming machine and became a thermoform operator and the second shift set-up technician on Sencorp thermoforming machines. After a period of time I was promoted to thermoforming manager. I worked as the thermoforming manager for three different employers between 1995 and joining U. S. Merchants in 2000. This included several years at Serv-All and several years at Berkeley Industries, both of which were significant Southern California packaging companies with thermoforming operations I then joined U.S. Merchants in 2000 and head up its thermoforming operation. I have also gone to trade shows, attended presentations and read industry materials to keep abreast of developments in the plastic packaging and thermoforming business.

3.      At all times since I joined Defendants in 2000, Defendants have been in the business of supplying custom-made plastic packaging to a variety of companies, many of which sell their products through wholesale clubs. Most of the plastic packaging is made by manufacturing plastic parts through a process called thermoforming and using radio frequency sealing processes to secure the products being packaged inside the thermoformed parts.

4.      The nature of Defendants' business requires "just-in-time" manufacturing of custom packaging and just-in-time delivery of packaged products to meet delivery deadlines dictated by wholesale clubs and other retailers. This requires Defendants to purchase plastic materials used for thermoforming in advance of production and to maintain a sufficient inventory

of materials to be able to produce the parts required to fill customer orders.   Just-in-time manufacturing enables the parts to be produced just before they are used to package products and is based on producing only the quantities necessary to fill client orders.

     5.     Between 2000 and 2006, Plaintiff Rocheux International of New Jersey, Inc. ("Rocheux") became Defendants' principal supplier of rolls of continuous sheets of plastic, sometimes called film, used in thermoforming.   Defendants ordered from Rocheux, by the pound, various types of plastic materials used to manufacture custom made, thermoformed, plastic parts to package and protect particular products.   The materials ordered included PVC (polyvinyl chloride), APET (amorphous polyethylene terephthalate), and G/A/G (a three-layered co-extrusion film with a layer of APET between layers of polyethylene terephthalate, also known as PETG).   Particular widths and thicknesses (gauges) are used for particular packaging jobs. The continuous sheets of plastic used in thermoforming arrive from the supplier on pallets containing rolls of the plastic material, similar to a roll of paper towels, except they are much larger and heavier, approximately the size of a large garbage can and each weighing more than a hundred pounds.   The pallets of individual rolls are typically stretch wrapped with plastic material to secure them on the pallet and to protect them. Beneath the stretch wrapped exterior are rolls of plastic material which are typically covered in protective plastic or paper material. These pallets of plastic materials are received by employees working in Defendants' receiving area and it is my understanding that they are then transported to an area of the Ontario plant where they are kept temporarily until they are brought to the thermoforming area for processing. In the thermoforming area, the protective coverings are removed for the first time. The plastic is unwrapped at the time it is going to be used in the thermoforming process. Rolls of plastic are placed at the end of the thermoforming machine, near the unwinder, and then loaded on to the

unwinder when they are needed. The unwinder serves the function of a paper towel or toilet paper holder in that it allows the roll to unwind as the plastic is fed into the thermoform machine where it will be heated, pressure formed around a mold or die and cut into a plastic packaging part.

6.    In my experience, rolls of plastic material for thermoforming are first inspected for apparent external defects or nonconformities, such as crushed cores and damaged edges, when a roll is staged by a thermoforming machine where it is being prepared for processing. This is the process followed by Defendants and it is also the process followed by my prior employers. When the rolls of plastic are ready to be processed, the pallets upon which the rolls were delivered are brought to the staging area, where the protective material, such as stretch wrap plastic, which encases the pallet of rolls is removed for the first time. It is at this point that Defendants have their first opportunity to inspect the rolls for externally visible defects or nonconformities. However, it is impossible to determine the true quality of the plastic from such an inspection.   It is not until the plastic is being unrolled and being used to produce thermoformed parts that most quality issues first become apparent. Prior to that time, only problems such as crushed cores or issues with the edges might be visible once the protective coverings have been removed from a roll. Rolls with these defects cannot be processed and would be placed to the side. In the absence of such defects, the plastic would proceed to be processed.

7.    To process the material and form the plastic to the desired shape, the plastic roll is placed on the unwinding machine, which unrolls the plastic and feeds it into the thermoforming machine which will heat the plastic, form the plastic, and cut the formed plastic into individual packaging parts.

8. Generally speaking, it is not until after the plastic has been processed into plastic parts and is undergoing a quality inspection that most of the defects are discovered. As a practical matter, this is the point that defects such as discoloration, flow marks, waviness, pitting, scratches, and deviations in thickness (gauge) are most typically discovered. In the thermoforming industry, it is not until this point in time that inspection of the plastic can reasonably be completed. Plastic parts with any or all of these defects are unusable. These unusable parts are discarded as scrap. The plastic parts formed by this defective material result in excess waste. There is no use for such material other than scrap. Even if the defects in the plastic material were caught before it was molded or formed into a plastic part, that portion of the plastic sheet containing any of the various defects identified above is unusable for any purpose except scrap. Some defects, such as a problem with being able to seal the material, does not become apparent until even later in the manufacturing process. Sealing problems do not become apparent until the plastic part has been loaded with the product it is to house and fails to seal properly as it goes through the sealing line. This is when a reasonable inspection will uncover a sealability problem. Plastic parts that have sealability problems are defective and have no use or value except as scrap. The inspection processes followed by Defendants are consistent with those that were followed by my prior employers.

9. As the plastic film supplied by Rocheux was unrolled and processed into parts, Defendants discovered the following various defects and nonconformities: discoloration; flow marks and waviness; pitting; scratches; sealability issues, (including inability to seal, cracking, inconsistent edges, plastic sticking to the sealing die); split rolls; and varying gauges. A substantial portion of the plastic provided by Rocheux was not of a quality comparable to that generally acceptable in Defendants' line of trade. Because it was defective and nonconforming,

it could not be used for its intended purpose and could not be provided to Defendants' customers. As a result, this useless and unusable material was allocated to scrap.

10.     While scrap or waste is unavoidable in the thermoforming industry, there is an acceptable level that is anticipated and expected.  The volume of scrap material that resulted from the rolls of plastic supplied by Rocheux, however, well exceeded typical percentages of scrap.  Because of this excess scrap, Defendants were forced to use more rolls of plastic than it would normally utilize to complete particular jobs; it would also take more time to complete particular jobs as well.

11.     In general, when we discovered defects or non-conformities, I promptly called the manufacturer to notify them.  With respect to defective and nonconforming Rocheux plastic, throughout the course of Defendants' relationship with Rocheux, I called either Allison Tuan Lee or Michael Flood every time there was a quality issue to report.  On each such occasion, I explained to them the particular defects Defendants were experiencing, that Defendants could not use the defective material, and that Defendants did not want the unusable plastic.  I asked them to come to Defendants' plant in Ontario, California to look at the defective and nonconforming Rocheux plastic.  I also told them that the material would be set aside and not sent to scrap for a short time in case they wanted to look at it.  On many occasions they said Mr. Flood would come by and look at the plastic, but he only came by on two or three occasions and generally did not do so.  If a Rocheux representative did not come to look at the material within a reasonable period of time, we followed our normal procedures for handling the plastic as scrap. Had Ms. Lee or Mr. Flood come to the plant upon my requests, they would have observed the various defects about which I notified them.  At no time did Ms. Lee or Mr. Flood ask me to

either retain the unusable plastic for an extended period of time or to return the unusable plastic to Rocheux. They gave me no instructions with respect to it.

12.     When I called Ms. Lee and/or Mr. Flood to notify them of the various defects I was always and repeatedly assured that Defendants would receive credits to their account for any and all defective and/or nonconforming material.   Replacement of unusable plastic was impractical because of the time, cost and disruption of ending a production run early, and setting up for another product, only to later set up and restart the initial production.  Given the just-in-time nature of Defendants' business, Defendants require that production continue from other rolls of plastic which Defendants have on hand.  Since the defects could only be addressed after the fact, the issuance of credits -- which Defendants could use to pay for plastic they had received or plastic they ordered in the future -- is the way most of the plastic suppliers I have dealt with deal with defective materials.

13.     All of the scrap material, including defective and/or nonconforming materials, unusable parts designated for scrap and crushed cores, is taken to an area of the warehouse where it is held for disposition.  Defendants have limited space to store scrap material and must dispose of it on a periodic basis due to space limitations. This is because it would be expensive and make no commercial sense to warehouse material which has no value except as scrap.  If defective and/or nonconforming plastic is recyclable it can be and is sold for a small amount of money as scrap.

14.     Mr. Flood told me that one of the plastic products, which he called RF sealable APET, would seal well and would not come apart.  We bought the product based on Mr. Flood's representation, but as described above in paragraphs 7 and 8, we suffered numerous sealability issues with the product, notwithstanding Mr. Flood's representations and assurances.

15.     When Rocheux made its first request for a formal inspection on or about September 7, 2006, Defendants made every effort to set aside any defective plastic that Defendants still had in their possession. However, the vast majority of the material had been discarded as scrap. The material was sent to scrap because, despite Defendants' repeated notifications and offers for Rocheux to come and inspect the defective and/or nonconforming material before it was disposed of as scrap, Rocheux neither inspected nor gave other instructions as to these materials.

I further declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration is executed at Ontario California this 11 day of April, 2010.

NICK MARGAROS